Staples, J.
This case brings before the court the-question of the liability of the State for plaintiffs’ tobacco, stored in a public warehouse in the city of Richmond, and destroyed by fire on the 10th March 1863. It is a question of novelty, and considerable difficulty. As there is no adjudged case, no precedent, to guide the court in its decision, we must act according to bur best convictions of the principles of law controlling the rights- and obligations of the parties.
This court held, in Chalkley’s case, 20 Gratt. 404, that the present government is not legally responsible for any debt contracted, or liability incurred, by the authorities having control of the State after the ordinance of secession was adopted. This decision has been the subject of some complaint and criticism. It is easy, however, to demonstrate that this is not the Richmond' government, nor the successor to that government, and consequently *44 that it is not answerable for the debts contracted by that government. It is well known that on the 19th June 1861, a convention assembled at Wheeling, adopted an ordinance reorganizing the State government, providing for the election of officers, prescribing an oath of fidelity to the Constitution of the United States and of the State, and declaring vacant all offices upon the failure of the incumbents to take the oath so prescribed.
- The government thus restored, as it was termed, continued until the adoption of the Alexandria constitution, on the 12th February 1864. Under this constitution a legislature assembled on the 19th June 1865, in the city of Richmond. It passed an act for the election of members of the General Assembly, and for taking the sense of the people in relation to the disqualifications for office imposed by that constitution ; and it required that all persons voting in such election should take an oath to uphold and- defend the government restored by the convention at- Wheeling. Under the authority of this act, the legislature of 1865 and 1866, and 1866 and 1867, assembled in the city of Richmond. The various acts passed by that body constitute important and valuable laws for the adjustment of many perplexing questions growing out of the war.
The government thus organized at Alexandria continued in existence until superseded by the reconstruction laws under which the present constitution was framed, and adopted by the people. How is it possible, in the light of these facts, to maintain that the present government is identical with, or is the successor to that Richmond government ? Besides all this, the constitution expressly prohibits the payment of any debt or obligation created in the name of the State of Virginia, “ by the usurped and pretended State authorities assembled at Richmond during the late war.” It is not our province 1 to discuss the propriety of this provision, or the language in which it is expressed. We are sworn to expound the *45 constitution and laws as they are written, and not as we would have them. The Eichmond government may have been the true and lawful government of Virginia, as maintained by some. Ho doubt it represented the views and wishes of a large majority of the people; but neither its contracts nor its liabilities can impose any legal obligation upon the State which the courts can recognize, under the present constitution and laws.
In Chalkley’s case, the contract was made with the Eichmond authorities, and the credit given to them or their agents exclusively ; and this court held that the present government could not be held accountable for the debt thus contracted. In the present case, it is true, the original contract, if such it be, was made in 1860 with the regular State government; but we are to consider the true import and operation of that contract, and how far it was modified or affected by subsequent events. This renders necessary a brief consideration of the statutes in regard to the inspection and storage of tobacco.. They are too numerous and complex to justify a citation in this opinion. It is clear, however, that they contemplate in the first instance an inspection and storage for a year; in which case the owner is not responsible for the payment of a rent. He may at the expiration of that period, or sooner, remove his property upon the payment merely of the officers’ fees for inspection, and the State charges. These charges and fees amount to sixty cents for each hogshead of tobacco inspected, stored, or delivered, and a special charge of thirty cents upon the hogshead, supposed to be intended for the risk of insurance. They are to be paid, as is conceded, whether the-deposit be for inspection merely, or inspection and storage, embracing one day or one year. But this compensation did not embrace a longer time than the year. At the expiration of that period, the. State might have repealed its statutes, or discontinued the arrangement, without any just cause of complaint. At the date of the= *46 inspection, or storage, it was bound to know the owner might continue the same for the year ; but it was not required to know that he would exceed that period. If the year being ended,, he elected to continue the storage, he might so do for three years, inclusive of the first year. In that event, however, anew contract arose—a new charge was made of five cents on the hogshead per month, in the nature of a rent for the use of the warehouse upon such extended storage. In this case the storage commenced between the 10th May, and ,the 2d November 1860. Upon the expiration of the year, they elected to continue the use and occupation of the,warehouse. At that time the government' with which the original contract was made had been overthrown, and another established in Its place, officers owing allegiance to, and deriving their -authority from, the new government, had the management and control of the warehouse in which the tobacco was stored. ■ The Confederate authorities had also established their capital in this city; ¿their officers 'and employees were in the occupancy of every available building, public and private, and their armies quartered within .and without the city limits, in every direction. Under these circumstances the owners of this tobacco thought proper to continue [its storage indefinitely in a warehouse not in the possession of the government with which they had contracted, nor under the direction of ■officers appointed by, and responsible to, that government. They made this election flagrante bello, and they persisted in it from month to month, and year to year, ■although the city was in continued danger of bombardment and conflagration. The plaintiffs must have had some information of the extraordinary events occurring here ; they must have been apprised that war existed ; that old governments were being . overthrown, and new •ones struggling into existence. If they were ignorant of ■these matters, it was their fault or .their misfortune. By the exercise of a very moderate share of diligence, they *47 might easily have informed themselves of occurrences which so much concerned them. The French consul resided in this city throughout the war. He should have kept them advised, and no doubt did, of the condition of affairs in this State. It is true, that the blockade would probably have prevented the removal of the tobacco from the country ; but there was nothing to interfere with its storage in some other and more secure place, under the supervision of the plaintiffs’ own agents. It is to be presumed that they preferred to continue the storage of the tobacco as it was, and to take the chandes of its preservation. They must be held to have done so with full knowledge of the consequences ; and they should be willing to bear the loss resulting from their adventure.
The learned counsel for the plaintiffs, in their petition for an appeal here, say that the State of Virginia insured against its own acts of omission and commission. It insured against any loss. by fire in consequence of its trotting itself off to Alexandria or Wheeling. It insured against any damage by fire in consequence of its abandonment, even if such a case were made out. All this might be true if the State had made a contract of insurance for any specific period beyond the first year of the storage, founded upon a valid consideration paid or stipulated to be paid for such risk. But I have already shown, or attempted to show, there was no such contract. The plaintiff’s tobacco at the time of its destruction had been on deposit nearly three years. For all this they had only paid certain inspectors’ fees at the date of the inspection. When they elected to continue the storage beyond the year, they well knew the government had been re-established at Wheeling. This fact was made known through its laws and its proclamations, through the recognition of the Federal Government, with which plaintiff’s government was in friendly and constant communication.
BuFthe position of the counsel is not sound in other *48 respects. The insurance of the State, if such it be* 77-0Dly extended to losses by fire. It did not comprehend damage or kss of the tobacco occasioned by floods, tempests, or captured by hostile armies or superior powers. With the single exception of the promise of indemnity in case of fire, the position of the State was-that of any other bailee for hire. Such bailee is only liable for the use of ordinary care and common prudence-in the preservation of the property intrusted to him; but he is not an insurer in any sense of that term. There is-no foundation for the pretension that the State insured, against its abandonment in the face of overwhelming, numbers. It insured against fire, but not against capture. Even as against insurance companies, to which the most stringent rules are always applied, it is well settled, that if there be an insurance against fire, and an exception by the assured in favor of capture, and the vessel is captured, and before she is delivered from that peril she is afterwards destroyed by fire, the loss is properly attributable to the capture alone. In Magoun v. New England Marine Ins. Com., 1 Story R. 157, 164,. Mr. Justice Story said it would be an over refinement and metaphysical subtlety to hold otherwise. In the-case of Dale v. New England Mutual Marine Ins. Co., 6 Allen R. 373, 395, Bigelow, C. J. said, “there is.no-stipulation in the policy that the insurers were to remain liable after the ship -had passed into the hands of her captors. * * * The eases in which it is held that where the insured is liable for capture, if followed by condemnation or detention for a prescribed period, and; a subsequent abandonment, he is also liable for any supervening peril occurring during the intermediate period, are not applicable to cases like the present, where-the risk of capture is not assumed by the underwriters. See, also, Lewis v. Springfield Fire and Marine Ins. Co., 10 Gray R. 159.
These views are founded on good sense and upon sound *49 reasoning. I do not perceive why they do not equally apply to this case. If the tobacco had been captured and appropriated by the Confederate government, or captured and destroyed by Federal soldiers, it will scarcely be maintained that the State is responsible for a loss occurring under such circumstances. As a general rule, it is true, where the property is destroyed by fire, the insurer is liable, though it were absolutely certain it would have been afterwards captured but for such destruction. But where the capture is made, and the damage from fire is the consequence of the capture, to impose the loss upon the bailee is to make him an insurer against both capture and fire. In this case the injustice is the more palpable because the owners, after the warehouse was taken by the Confederate government and appropriated by the Confederate authorities, might have taken possession of their property without the least difficulty.
The condition of the country at the time of the destruction of this tobacco, and indeed long before, is within the recollection of all. In the language of Mr. Justice Nelson, Mauran v. Insurance Company, 6 Wall. U. S. R. 14, a government in fact was erected greater in territory than many of the old governments of Europe, complete in the organization of all its parts, containing within its lines more than eleven millions of people, and of sufficient resources in men and money to carry on a civil war of unexampled demensions; their vessels captured recognized as prizes of war, and dealt with accordingly; their property seized on land referred to the judicial tribunals for adjudication; their ports blockaded, and the blockade maintained by a suitable force, and duly notified to neutral powers, the same as in open and public war.
No one can for a moment entertain the opinion that either the plaintiffs or the State ever contemplated this state of things. The compensation agreed to be paid had no reference to such a risk. The State could hardly *50 have been expected, for a charge of five cents per month on each hogshead of tobacco, to assume all the hazards ; of war, invasion, and conquest. It did not undertake, it was not asked to insure, against any peril except that of fire. But as the fire. occurred long after the warehouse had been wrested from the possession of the insurer by overwhelming numbers, the loss must be regarded as attributable to the capture, and not by any reasonable intendment within the terms of the contract. For these reasons I am of opinion the judgment of the Circuit court should be affirmed.
The other judges concurred in the opinion of Staples, J.
Decree arrirmed.