Staples, J.
The important question in this case relates to the legacy of Samuel Bushong, a resident of the state of Indiana. This legacy was, in March 1862, reported by the executor to a Confederate receiver, and was confiscated as the property of an alien enemy. According to the statement of the executor the fund had been in his hands since July 1861, part of the proceeds-of the sale of personal estate belonging to the testatrix. There is no evidence of his assent to, or his participation in, the act of confiscation. On the contrary, it is to be inferred that he only made the report andpayment because he was ordered so to do by the proper authorities. The question is now presented, whether the payment thus made protects the executor against the claim of the legatee.
In order properly to discuss this question, the acts of confiscation or sequestration passed by the Confederate-Congress must be briefly noticed. The first of these was passed 30th of August 1861, the second, amendatory thereof, the 15th February 1862. It is unnecessary to state in detail the various provisions of these acts. It will be seen by a reference thereto, it was made the duty of every person having in his possession or under his con *631 trol the effects of an alien enemy speedily to inform the receiver in his district of the fact. A failure so to do ■ was declared a high misdemeanor, punishable by fine and imprisonment, and also a forfeiture of double the amount, at the suit of the government. It was also provided, that any person who, after giving, such information, should fail to pay over and deliver on demand made by the receiver, the money or effects in his hands, shall stand in contempt, and be proceeded against as in other cases of contempt. And the court or judge was authorized to imprison the offender until he should fully comply with the requirements of the act.
Under the provisions of the original act, the court was empowered to leave the sequestered property or effects in the possession of the debtor or other person, requiring security for its safe-keeping, and payment or delivery whenever required by the court. The amended act, however, makes a very material change in this respect. That act creates a distinction between persons in actual possession of, or having under their control, the effects of alien enemies, and persons owing debts to alien creditors. In the former case immediate payment or delivery was required to be made to the receiver without qualification or condition. In the latter case payment of interest was only exacted, and no execution could be issued during the war against the debtor who faithfully complied with the statute in giving information of his indebtedness. The reason of this distinction is apparent. A trustee, fiduciary or other .person having property or money in his actual possession, or under his control, could not justly demand any delay or indulgence. There could he no valid reason why payment should not at once be made to the receiver. A mere debtor, on the other hand, might be subjected to considerable inconvenience in making such payment, and as by the laws of nearly all the states South, the collection of debts was stayed, the Confederate government extended the same indul *632 gence to parties indebted to alien enemies. Iu the present case the fund was deposited in bank to the credit of the executor, and was therefore under his control. He 7 was within the express terms of the law, and the question is, was he bound to obey it.
it will be observed that these provisions were of a highly stringent character. That the Confederate government had the power to enforce them, no one familiar with the history of that period will question. It was a government of paramount force, to whose laws and mandates every citizen within its jurisdiction was constrained to yield implicit obedience. Indeed this was conceded in the argument. It was said, however, that this government was an unlawful and treasonable organization, and no act done under its authority prejudicial to. the rights of loyal citizens of the United States can'be recognized as valid by the courts.
In support of this view7, an opinion of Chief Justice Chase, delivered at Richmond in Keppell’s administrator v. Petersburg Railroad company, is relied on. It seems that Mrs. Keppell was a stockholder in that company, and that a part of her stock was confiscated and sold during the war. In a suit against the company by Mrs. Keppell’s administrator, the company claimed a credit for the dividends paid to the Confederate receiver and to the purchasers of the stock sold. The learned Chief Justice conceded that if the dividends belonging to Mrs. Keppell had been set apart to her specially, and the money thus set apart had been taken from the officers of the company without their consent, by the application of force, either actual or menaced, under circumstances amounting to duress, the loss must have been borne by her. But nothing of the kind appeared. Ho dividends were set apart; there was no force actual or threatened. On the contrary, the conduct of the company afforded a reasonable inference that they were not involuntary accessories to the w'hole action of the government. The *633 facts of the case are not reported in the volume to which we have been referred. It is therefore somewhat difficult to understand what is meant by the expression “ application of force actual or menaced, under circumstances amounting to duress.” We are not told how far the person holding the effects of an alien enemy was required to go—what amount of resistance he was expected to display in defence of property belonging to a loyal citizen of the United States.
A government of supreme authority denouncing the penalties of fine, imprisonment and forfeiture upon acts of disobedience to its proclaimed will, affords as strong an illustration of “menaced force” as can well he imagined. What does it matter that such a government is unlawful. A citizen may be justified in resisting tyi’anny and oppression, but he is under no obligation, nor can he be required to engage in a hopeless and dangerous contest with the government under which he lives, however illegal it may be, in defence of property confided to his care either as bailee, agent or executor. In Thorington v. Smith, 8 Wall. U. S. R. 1, Chief Justice Chase declared that obedience to the authority of the Confederate government in civil or local matters was not only a necessity but a duty. Why should a different rule be established with respect to this executor. Had he refused to pay over the money, every one familiar with the history of that period, and the temper of the public mind, knows well the whole power of the courts •and the laws would have been exerted against him to enforce obedience. What was he to do under such circumstances ? How far was he to go in his resistance to the law ? Was he to submit to fine and imprisonment, or would the threat of an attachment for contempt have excused him in surrendering the fund ? I think the executor was well justified in refusing to incur these hazards. He wisely declined a contest with a government which the whole naval and military power of *634 the United States could not subdue under four years. We are not disposed, however, to rest the decision of this case upon this narrow and restricted view. It may be placed upon a higher ground. In Walker v. Christian, 21 Gratt. p. 291, 301, Judge Moncure, speaking for the court, said, “ It is immaterial to enquire whether the Confederate government was de jure or defacto only ; and if defacto only for what purpose and to what extent it was a de facto government. That it was such a government to a considerable extent and for many purposes, if not entirely and for all purposes, cannot be denied.” It is said, however, by an eminent Federal judge that the Confederate government did not possess all the attributes of a government defacto in the highest degree. The reason, he assigns, is it never expelled the regular authorities from their customary seats and functions. It never held the [national capital. It never asserted any authority to represent the nation. The conclusion he deduces therefore is, it must be regarded as an unlawful organization, and all its acts and proceedings for the confiscation of the property of loyal citizens must be treated as absolutely null and void.
The test here suggested may be a correct one, when applied to a people having but one central consolidated government. In such States or communities, as a general thing, the object of every revolutionary movement is to overthrow and expel the existing government, to occupy the capital and give laws to the nation. So long as the organization falls short of this result, it may be a question whether it possesses the attributes of a de facto government in the highest degree. However this may be, the test suggested cannot injustice be applied to the Confederate States. They did not attempt or desire to occupy the national capital as their seat of government, nor to give laws to the people of the United States. The whole scope and object of the movement was a separation from the northern States: the formation of an *635 independent confederation ; the establishment of a new government over their own people within their own territorial limits and jurisdiction. How eminently successful this struggle was for four years, at least, in the attainment of these objects, let the Supreme court of the United States answer. In Mauran v. Insurance Company, 6 Wall. U. S. R. 1, the question was presented, whether a Northern insurance company was liable for the value of a vessel captured by the naval forces of the Confederate government. Mr. Justice Nelson, in discussing the principles governing the rights and liabilities of underwriters in such cases, used the following language : “ Still it cannot be denied but that by the use of these uulawful and unconstitutional means a government in fact was erected, greater in territory than many of the old governments of Europe, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources in men and money to carry on a civil war of unexampled dimensions ; and during all which time the exercise of many belligerent rights were either conceded to it, or were acquisced in by the supreme government; such as the treatment of captives both on land and sea as prisoners of war, the exchange of prisoners ; their vessels captured, recognized as prizes ol war, and dealt with accordingly ; their property seized on land referred to the judicial tribunals for adjudication; their ports blockaded, and the blockade maintained by a suitable force, and duly notified to neutral powers, the same as in open and public war.”
Again, elsewhere he declares, “We refer to the conduct of the war as a matter of fact for the purpose of showing that the so-called Confederate States were in the possession of many of the highest attributes of government, sufficiently so to be regarded as the ruling or supreme power of the country, and hence captures- *636 under its commission were among those excepted out of policy by the warranty of the insured.”
acknowledge the force of this description, the accuracy and truth of the picture. If the laws an(l mandates of a government thus organized and powerful, will not protect those who were subject to its jurisdiction and yielded it obedience, it is idle to say that the citizens or subjects of a mere defacto government in any case, can claim exemption under its authority. In Thorington v. Smith, Chief Justice Chase expresses the opinion, that the Confederate government may be classed among the governments of which those established at Castine and Tampico are examples. Let us see then what was decided with reference to Castine. It was an American port captured by British forces in 1814, and held in possession of British authorities until the treaty of peace in 1815. During that period foreign goods were received into the port, under regulations established by the enemy. Some of these goods remained in Castine until after the close of the war. The United States government then asserted a right to levy imports and duties upon them. The Supreme court of the United States decided this claim could not be sustained ; that by the conquest and military occupation of Castine, the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty. By the surrender the inhabitants passed under a temporary allegiance to the British government; and were ■bound by such laws, and such only, as it chose to recognize and enforce. BTow, if the learned Chief Justice be correct in likening the Confederate government to the military occupation of Castine, it would seem that the same results must follow in both eases. 'The law of paramount force, w'hich protected the citizen against the claim of the United States, would also protect the bailee or fiduciary, who had surrendered the *637 fund in his hands to the supreme authority of the country. In such case it does not matter that such authority is denounced as unlawful and treasonable. The same thing may be said, ofaevery mere de facto government It is unlawful, because it is simply de facto. The right to confiscate the property of enemies during war does not depend upon the lawfulness of the government which enforces it. It is derived from a state of war, and is called the right of war. Accordingly, when things in action are confiscated, peace being made those which are paid are deemed to have perished ; but those not paid revive and are restored to their true creditors. Ware v. Hylton, 3 Dall. R. 227 ; Vattel Book 3, chap. 8, § 138, and chap. 9, § 161.
In the prize cases, 2 Black. U. S. R. 636, the doctrine that the parties to a civil war are in the same predicament as two nations who engage in a contest, and have recourse to arms, was fully recognized and sustained. It was also there held, that the civil war between the United States and the Confederate States, attained such character and magnitude as to give to the United States the same rights and powers which they might exercise in the case of a national or foreign war. Among these was the right to blockade Southern ports against neutral nations ; the right to treat as public euemies all persons residing within the territory controlled by Confederate authorities, and to seize and confiscate their property. These were declared to be belligerent rights resulting from a state of war—applicable alike to civil and to foreign wars. It was upon this principle the United States authorities seized and confiscated the cotton of Mrs. Alexander, a widow lady residing in the State of Arkansas, who did not even sympathize with the people of the South in the struggle for independence. The Supreme court of the United States sustained the act, declaring that the personal dispositions of individuals-inhabiting enemy’s territory, cannot in questions of cap *638 ture, be the subject of enquiry. 2 Wall. U. S. R. 405.
According to the laws of nations, the justice of the cause being reputed equal between two enemies, whatever is permitted to one in virtue of a state of war, is also permitted to the other. Vattel, 382. It does not matter how the struggle terminated—who the victor and who the vanquished. The question,is not one of right, but of power, appertaining to a state of war—power -flagrante bello. The government of the United States may exercise both sovereign and belligerent powers. In its soverign capacity it may punish treason by seizing and confiscating the property of the guilty party. This, however,can only be doueby the conviction of the offender according to the forms and requirements of the constitution and laws. His guilt must be made to appear judicially. The constitution throws the shield of its protection around the citizen, by declaring that no one shall be deprived of life, liberty or property, except by due process of law. When, however, civil war exists, and the government asserts the rights of a belligerent, such as appertain to a state of war between independent nations ; treating all the inhabitants of the opposing section as public enemies ; blockading their ports against neutral powers ; seizing and confiscating their property without trial and without conviction ; it must be content to accept all the results which flow from the position thus assumed. In the prize cases, it is admitted by Mr. Justice Grier, that the parties in a civil war usually concede to each other belligerent rights. In the same cases, Mr. Justice Nelson delivering a dissenting opinion, in which Judges Taney, Catron and Clifford concurred, said: “In the case of a rebellion or resistance of the people of a country against the established government, there is no doubt, if in its progress and enlargement, the government thus sought to be overthrown sees fit, it may by the competent power recognize or declare the existence of a state of civil war, which will *639 draw after it all the consequences and rights of war between the contending parties, as in the case of a public war. And in defining the legal consequences resulting from a public war, he declares, “All the property of the people of the two countries on land or sea are subject to capture and confiscation by the adverse party as enemy’s property ; with certain qualifications as respects property in land.
In Wheaton the same doctrine is thus announced : “ But the general usage of nations requires such a war (civil) as entitling both the contending parties to all the rights of war as against each other, and even as respects neutral nations. Wheaton Int. Law, page 296; The Tropic Wind, Law R., July 1861 ; Hughes v. Letsey et. al, 5 Law R. 148 ; Price v. Poynter, 1 Bush. Ken. R. 387 ; Coolidge v. Guthrie, U. S. Circuit court for Southern district of Ohio, vol. 8 Am. Law Reg. 22.
It has been urged here and elsewhere that the government of the United States might at the same time exercise both belligerent rights and sovereign rights: belligerent with regard to the opposing section, and sovereign in punishing individuals eugaged in resisting its authority. It might be demonstrated, I think, that inasmuch as the war was carried on by sovereign states, associated in a common confederacy, exercising the highest attribute of government, that no citizen taking up arms under the authority of that government, and yielding obedience to its laws and mandates, can be held amenable to the penalties of treason. It is, however, unnecessary for the purposes of this case to establish that proposition. Let it be conceded that the government having reduced the people of the South to submission has the right to treat them as rebels and traitors. The same may be said of every established government; and the-argument carried to its legitimate results proves that in ¿ civil war belligerent rights can only be exercised by the successful party.
*640 It may be that the laws of tbe Confederate government can no longer be enforced, and that no person can claim exemption from punishment for treason under that . , ... ... , . authority ; but what is to be said m respect to contractsmade5 rights vested, payments made, liabilities incurred, duties and obligations enforced, whilst such laws were in operation. The government of the United States was-unable to afford any protection to this executor at the time of this transaction. Its courts were not only closed against him, but he was declared an enemy of the United States ; and his property liable to capture and confiscation by the authorities of that government. Whatever security he had against violence and wrong— whatever protection for person and property, was derived from the Confederate government. Protectiop and allegiance are correlative obligations. As the citizen is justified in obeying the laws which protect him, so his rights- and liabilities in civil and local matters must be tested and settled by the rules of the government which has-dominion over him.
The government of the United States obtained many important advantages by the exercise of belligerent rights during the war. It seized and confiscated millions dollars worth of property belonging to southern citizens-who had taken no partin the struggle. It was relieved from all responsibility for acts done on Southern soil and on the ocean by the armies and navies of the Confederate States. Its blockade of Southern ports was respected ; and its right to exert against neutral commerce-all the privileges of a party to a maratine wrar, fully recognized. The people of the Northern states approved this policy of their government, and reaped all the advantages flowing from it. Por the losses they thereby ustained they must for redress look to the government which claimed their allegiance and received their seiv vices. Considerations of natural justice and equity; the laws and usages of nations, require that the people *641 of the South shall not be placed in the position of insurers of funds in their hands lost by the accidents of war.
In considering this case, I have been content to concede that the government of the Confederate States was only a government defacto. Whether it was not during its existence something more, is a proposition in regard to which statesmen and jurists will differ so long as a trace of the struggle remains; so long as the fundamental principles of the government excite discussion among men. The decision of that question is not rendered necessary in any aspect of this case. Should it ever arise I trust this court will meet it with the gravity and deliberation its importance demands.
The other judges concurred in the opinion of Staples, J.
The decree was as follows:
This day came again the parties by their attorneys, and the court having maturely considered the transcript of the record of the decree aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that as the sum of money due by John Newton, executor of Mary C. Bushong, to Samuel Bushong was confiscated to the Confederate States, and was paid by the said John Newton to Thomas J, Michie, receiver of the said Confederate States, the said John Newton was thereby discharged from all liability for the same to the said Samuel Bushong; and the Circuit court, therefore, erred in decreeing payment of the same, with interest thereon, to him. And as to the sums of money and interest decreed to be paid to Peter Y. Bushong, Mary A. Bushong and Jacob Cox, respectively, the court, without now intending to express any opinion in regard to the liability of the said John Newton, or his estate, for the same, is of opinion that it was premature in the said Circuit court to render a de *642 cree in that respect in the then state of the record ; and that instead of doing so, the court should have directed an inquiry by a commissioner to ascertain whether the bonds taken from purchasers at the sale of the personal property of his testatrix, or any of them, and if any, which of said bonds and what amount remained uncollected at the end of the war; also whether he applied the funds of the estate of said testatrix, or any part thereof, and if any, how much thereof, to his own use ; and whether, after receiving the said funds, he always kept them, or an equal amount, either in his own hands or in bank, or in some other safe or usual place of deposit, or invested in Confederate bonds, ready to be paid or handed over to the parties, respectively, entitled thereto, whenever he could do so, until the said funds or money so kept by him perished in consequence of the war. And the commissioner should also be required to state specially any other facts he may deem material, or which may be required by either of the parties to be stated.
Therefore, it is decreed and ordered, that the said decree of the Circuit court be reversed and annulled, and that the appellees, Samuel Bushong, Peter V. Bushong, Jacob Cox and Mary A. Bushong, pay to the appellant the costs by him expended in the prosecution of his appeal aforesaid hére; and it is ordered that the cause be remanded to the said Circuit court for further proceedings to be had therein, in conformity with the foregoing decree : which is ordered to be certified to the said Circuit court of Augusta county.