Burks, J.
In the month of August, 1860, the appellant, Matthew Pilson, as executor of the will of John S. Thompson, deceased, and in the exercise of a power *234 conferred by the will, made sale of the lands of Ms testator. Tlie sale was made for one-fourtli of the purchase money in cash, and for the residue in three equal annual payments. To whom the sale was made, and how the payment of the deferred instalments was secured, if secured at all, does not appear, except that bonds were taken for these instalments.
Pilson was trustee, under the will, of the legacy bequeathed to the appellants, Jacob Lightner and wife, and was required by the will to invest the trust fund as he thought best. This fund, which arose from the sale before mentioned, amounted to a little upwards of $5,000.
Previous to this sale, to-wit: on the 9th day of July, 1860, the appellees, Peter Y. Bushong, Mary A. Bushong, and Samuel Bushong, together with the other heirs of Abraham Bushong, deceased, executed to the appellee, John J. Larew, a power of attorney, authorizing Mm to make sale of their land in the county of Augusta, Virginia, on the same terms precisely on which the Thompson land was sold, to collect the different instalments of the purchase money as they became due, and pay the same over to them, agreeing to allow him a fair compensation for his services.
Pilson, with, a view of investing the Lightner trust-fund, on the 7th day of September, 1860, purchased the land of the Bushongs at a price sometlffng less than $5,000, upon the terms before stated, corresponding with the terms of sale of the Thompson land. ITe paid to Larew (the agent) the cash instalment (one-fourth) of the purchase money, also the share of Jackson Bushong in the whole, executed to Larew as agent Ms individual bonds for the deferred instalments, and on the 14th day of September of the same year, the Bushong heirs, by *235 deed of that date, conveyed the land to Pilson as trustee for Lightner and wife.
At the date of the purchase by Pilson, all of the ■ Bushong heirs, except Jackson Bushong and the appellee Samuel Bushong, resided in the state of Virginia. The said Jackson Bushong and Samuel Bushong were citizens of the state of Indiana. Larew paid over to the resident parties their respective shares of the cash instalment as soon as he received it from Pilson, and afterwards to Samuel Bushong his share thereof, and to Jackson Bushong his full share of the whole purchase money, which had been collected, as before stated, from Pilson.
Some time in the spring of 1861, precisely when does not appear, the appellees Peter V. Bushong and Mary A. Bushong, went to the state of Indiana. Before leaving Virginia, they informed Larew that they were going on a visit and intended to return in the fall, and instructed him particularly to collect the first deferred instalment of the purchase money for the land owing by Pilson, and have their part ready for them on their return. They did not return at the appointed time, nor at any time during the war.
When and as the bonds of Pilson became due, to-wit : in the month of September, 1861,1862, and 1863, Larew collected the amounts thereof from Pilson in Confederate States treasury notes. These notes were but slightly depreciated in September, 1861, were considerably depreciated in September, 1862, and were greatly depreciated in September, 1863. Of the collections thus made, he paid to the parties residing in Virginia and present their respective shares, and they were satisfied. By proceedings instituted by some unknown person under the sequestration or confiscation acts of the Confederate States, he was compelled to pay to the receiver under those acts Samuel Bushong’s share of the money col *236 lected. This was a valid payment, and a full discharge of all liability for Samuel Bushong’s share of the purchase money for the land bought by Pilson. Newton’s ex’or v. Bushong & al., 22 Gratt. 628.
The residue of the money in the hands of Larew belonged exclusively to the appellees Peter Y. Bushong and Mary A. Bushong. It was invested by him in bonds of the Confederate States, and these bonds, remaining in his hands, perished with the Confederate government. The question is, who shall bear the loss.
One-tliird of the amount thus invested, was collected by Larew from Pilson in September, 1861, and I have no hesitation in saying that to this extent the loss should be borne by the appellees, Peter Y. Bushong and Mary A. Bushong. When they left the state in the spring of 1861 on a visit to the west, they informed Larew that they would return in the fall, and instructed him particularly to collect their money which would be due from Pilson the following September, and have it ready for them on their return. The currency in which he .made the collection was not sensibly depreciated, and he was ■well warranted in receiving it. If these appellees had returned according to promise, the money would doubtless have been paid over to them. By their failure to return, their agent vras compelled to make the best disposition he could of the money collected. He did not convert it to his own use, but kept it for a considerable time, supposing that they might and probably expecting that they would still return to the state during the war. At length, as they did not return, he concluded to invest the money in Confederate bonds, as the best thing that could be done for them under the circumstances. He acted in perfect good faith, and with at least ordinary prudence. The loss -was occasioned by the default of those entitled to the money, and they only should bear it.
*237 But this is the only part of the loss, which, I think, these appellees should hear. Larew’s agency was created before the war, and at a time when war was not anticipated. It extended to the collection of bonds payable at a future time and solvable only in gold coin or in currency equivalent thereto in value. Except under peculiar circumstances he could not lawfully depart from the power of attorney under which he derived his authority, unless specially instructed to do so. He was virtually so specially instructed in regard to the collection of the bond falling due in September, 1861. But he received no special instructions in regard to the collection of the bonds becoming due in September, 1862, and September, 1863. In the absence of such instructions, the power of attorney was his only authority to act, and that gave him power only to collect the money which the bonds called for. Ward v. Smith, 7 Wall. U. S. R. 447; Alley & als. v. Rogers, 19 Gratt. 366; Ewart v. Saunders, 25 Gratt. 203.
There were no special circumstances, so far as the record discloses, requiring the collection in Confederate currency in 1862 and 1863. The parties entitled to the money were not present to receive it, and wdien collected it could not have been remitted to them, and if it could have been remitted, it would have been useless to them in the locality in which they were. These facts were well known both to Pilson and Larew. PTor, so far as appears, was there anything in the pecuniary condition of Pilson (the debtor) which made it proper for the agent to receive from him in discharge of his bonds anything of less value than the bonds called for and the power of attorney authorized to he collected.
The conclusion is that, according to my judgment, either Larew or Pilson should he required to make payment to the appellees, Peter Y. Bushong and Mary A. *238 Bushong, of their respective portions of the bonds of Pilson, which fell due in September, 1862, and September, 1868. The question is, which of the two shall he required to make the payment; and if Pilson, whether he should be required to make payment out of his own estate, or as trustee out of the trust funds in his hands, as the decree appealed from provides.
I think Larew was properly exonerated from liability by the circuit court. lie was placed in such circumstances by Pilson that he was compelled to receive the Confederate currency, or by his refusal to receive it to encounter for himself and those he represented, such hazards as no debtor has the right to impose on his creditor. Duress, in a technical sense, is constraint of the will by actual force or threat of it sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness; threat of loss of life, of member, of mayhem, imprisonment, and, according to some modern decisions of high authority, of battery to the person, or destruction of property. United States, Lyon & al. v. Huckabee, 16 Wall. U. S. R. 414, 431, 432; Brown v. Pierce, 7 Wall. U. S. R. 205; French v. Shoemaker, 14 Wall. U. S. R. 314, 332; 2 Minor’s Institutes, 375, et seq.
The means used by Pilson to induce Lerew to receive depreciated currency in discharge of bonds payable in gold coin or in a currency equivalent in value to gold, may not have amounted to duress in the strict sense above indicated, but they -were designed and were sufficient to control that perfect freedom of will and conduct, which Larew, as agent, ivas entitled to exercise in the matter. lie was unwilling to receive the currency. He refused to receive it. It was his right, and, under the circumstances, his duty to refuse. He did not take it until he was told by Pilson, that if he did not take it, he *239 (Pilson) would, as stated by Larew in his deposition, “report the facts” to the Confederate receiver, or as Pilson, in his own deposition says, “would report to the receiver and pay the money to him.” This was not a direct threat of Pilson to have Larew subjected to the severe penalties of fine and imprisonment imposed by the Confederate acts fox' the failiwe of a debtor of a nonresident to report the debt to the receiver; but “the report of the facts,” as Pilson professed to believe them, would cei’tainly have exposed Larew to the hazard of such penalties. Lor Larew then had in hands the money of Peter V. Busliong and Mary A. Busliong collected in September, 1861, and which had been released from confiscation by the receiver on the representation of Larew, that although absent, they were still citizens of Virginia. If, upon further investigation, which would have been necessary under “the report of facts” made by Pilson, the receiver had come to the conclusion that these parties were non-residents and alien enemies, as it is now claimed they were, Larew might, perhaps, have been subjected to the pains and penalties imposed by these laws.
Besides the personal danger which, would have been incurred by Larew, if Pilson’s threat, for such it was, had been carried out, the debt due the absent parties would have been put to great hazard. Although they may not have been alien enemies, the condition of the country and the temper of the times were not well suited to a calm investigation of a matter of controversy between resident debtors here and creditors absent, though temporarily, in the enemy’s territory.
The absence of Peter V. Busliong and Mary A. Bushong on a visit to Indiana did not make them citizens of that state and alien enemies to the people of this commonwealth. Their domicile was in Virginia. To *240 become citizens of another state, they must have changed their domicile. Residence, with no present intention of removal, constitutes domicile. Mere change of place is not change of -domicile. Mere absence from a fixed home, however long continued, cannot work the change. There must be the animus to change the prior domicile for another. To constitute a new domicile, two things must concur: first, residence in the new locality; second, the intention to remain there. Until the new domicile is acquired, the old one remains; and whenever a change of domicile is alleged, the burden of proving it rests on the party alleging it. These principles are said to be axiomatic in the law on the subject. Mitchell v. United States, 21 Wall. U. S. R. 350, 353; Story’s Conflict of Laws (7th ed.) §§ 43, 44.
The affidavit of Peter V. Bushong and Mary A. Bushong, filed in the cause for the purpose of having it removed to the Federal court, is not sufficient to show that in September, 1862, or September, 1863, these parties had become resident citizens of the state of Indiana, and Pilson had no good cause for his threat of proceedings to have the property of the absent parties confiscated. The circumstances, under which the threat was made, show that his sole purpose was to operate upon the fears of Larew and constrain him to give a discharge from obligations, which Pilson had no right to demand, and Larew as agent no authority to grant.
It was claimed in argument at bar, that Larew never objected to receiving the Confederate currency until the last payment was made in September, 1863, and that it was then for the first time that Pilson said to him, that if he did not receive the currency, he would report to the receiver. I think the proof is otherwise. It was not until Pilson filed Ms answer to the last supplemental bill, that he. denied in positive terms that he had made the *241 remark attributed to Mm when payment was ’ made in 1862. In Ms answer to the first amended bill, he stated that “he had no recollection of any question as to 'the receipt of the money on any occasion, except when the last bond was paid.” In his deposition before that, he said that Larew “ at one time manifested reluctance to take the money, particularly the last payment.” These somewhat inconsistent statements are overcome by the positive testimony of Larew that Pilson made the threats ás well in 1862 as in 1863.
' I do not think that Pilson has ever legally discharged that portion of his bonds falling due m 1862 and 1863, ■which belonged to Peter Y. Bushong and Mary A. Bushong ; that he continues debtor to them to that extent, and should he inquired to make payment, and make it out of his own means. Although he purchased the land of the Bushongs for his cestuis que trust, yet his contract of purchase was wholly a personal one on Ms part. lie gave Ms individual bonds for the purchase money, gave no other security, and the Bushong heirs conveyed the land to him as trustee without retaining any lien. In the sale, they gave no credit to the trust fund, and have no right to resort to it for the payment of what Pilson alone in his individual character is bound to pay to them.
Whether Pilson is entitled to full indemnity, or to any indemnity, out of the trust fund in his hands, for what he may be required to pay out of his own estate, depends upon the equities between himself and his cestuis que trust: equities which have not been developed by the pleadings and proofs in this cause sufficiently for a decree to be made thereon between the co-defendants.
I think, therefore, the circuit court erred in not entering a personal decree against Pilson at the hearing of the cause on the first amended bill, but inasmuch as he was made a party defendant to the last amended bill,. *242 not only in Ms own character as trustee, hut also in his own right, the error in the former decree may be corrected in passing upon the last, wMch is the final decree in the cause.
Upon'the whole matter, I am of opinion to amend the decree complained of by ordering that the principal sums, interest, and costs therein mentioned, he paid by Pilson out of his own estate, instead of out of the trust funds in his hands, as the decree of the circuit court directs, and further to amend it by providing that it shall be without prejudice to any equity which the said Pilson may show himself entitled to as agamst his cestuis que trust, for indemnity out of the trust funds in his hands in any proper suit winch he may he advised to institute for that piupose; and the decree so amended to affirm with costs in tMs court against the said Pilson in behalf of the appellees (except Samuel Bnshong) as the parties substantially prevailing here.