Christian, J.
There are certain preliminary questions to be disposed of before we pass upon the merits of the controversy.
First, It is insisted in behalf of the appellants, that the appeal in this case was improperly taken to the county court, and that it ought to have been taken directly to (he circuit court.
The decision of this question depends upon the true construction of the 10th and 13th sections of chapter 47, Code of 1873, page 443.
These two sections give the right of appeal from a ^decision of the board of supervisors, in general terms, both to the counties and to claimants against the county, to the county court. Appended to each section is a separate clause, following those clauses of the sections giving the right of appeal to the county court, which separate clauses are in these words: “Except that in case that-where the decision complained of is upon an order made by the county court or the judge thereof, or in a case involving the constitutionality or validity of an ordinance or by-law of a corporation, the appeal may be taken to the circuit court having jurisdiction over said county or corporation.”
I think it is plain that this clause was added in order to dispose of those claims which might arise upon orders made by the county courts as organized under the present constitution, and has no reference to claims arising upon orders of the county court made when composed of justices of the peace, which I courts had been abolished by the new constitution when this act went into operation. The terms used in the proviso — “county court or judge thereof” — plainly indicate that this clause applies to the county courts as at present organized. Claims that arise under orders of the county courts which had been abolished might well be adjudicated by the county court as at present established, held by a judge learned in the law, as required by the present constitution. But it would be incongruous, and amount to a barren right of appeal, if the claim allowed or disallowed by the board of supervisors, which arose “upon an order made by a county court or a judge thereof,” should be adjudicated by the same court or judge that made the order which is the foundation of the claim. In such a case it was proper to provide another tribunal to which the aggrieved party may appeal; and in such *a case the legislature wisely provided another and independent tribunal, to-wit, the circuit court. This, however, is in terms an exceptional case, and applies only to cases where the claim arises upon an order made by the county court as at present organized. or the judge thereof. In these cases the right of appeal may be taken to the circuit court having jurisdiction of the county or corporation. In all other cases the right of appeal is to the county courts. In the case before us the claim not being founded upon an order of the county court as at present organized, or the judge thereof, but on an order of a county court composed of justices (which is no longer in existence), the right of appeal from the decision of the board of supervisors was properly taken to the county court, and comes within the general provisions of the statute, and not under the exception. I am therefore of opinion, that the appeal in this case was properly pending in the county court; and that the proceedings in that court, and afterwards in the circuit court, by appeal from the county court, were regular and proper, and that the case is properly now before" this court for its final adjudication.
I am further of opinion, that the paper exhibited in the record as the bond of the county of Dinwiddie is invalid as a bond. Such invalidity, however, did not arise from any want of legal form. In form and legal effect it is a bond. It is an obligation, on the part of the county oí Dinwiddie, to pay a sum certain to Stuart, Buchanan & Co. It is sealed with the seal of the court. The seal is acknowledged in the body of the instrument as follows: “being a bond created by order of the county court of Dinwiddie, made in pursuance of an act of the general assembly of Virginia,” &c. This is equivalent to saying, being *an instrument under seal', an is a sufficient recognition of the I seal in the body of the instrument. But this paper is invalid, I think, as a bond of the county, because it does not appear from the record, that at the court at which it was executed the justices had all been summoned, or that a majority of them were present. Indeed, it appears that only three of these justices were present. It cannot be presumed, in a case like this, that the justices had been summoned. This ought to appear affirmatively, or the record should show that a majority was present. The court was acting upon a matter of special jurisdiction, conferred by a special statute, and upon a mat *172 ter outside of its general jurisdiction.
The case does not, therefore, come within the doctrine declared by this court in Ballard & als. v. Thomas & Ammon, 19 Gratt. 14. Here the jurisdiction was special, fixed by a special statute, and must be exercised in accordance with the provision of the statute; that is, either when the justices had all been summoned, or when a majority was present. The proceedings in this case (the execution of a bond), not being a judicial proceeding within its ordinary jurisdiction, must be shown affirmatively to be strictly within the provisions of the statute under which the proceeding was had. I am, therefore, of opinion, that the bond referred to was invalid, as a bond. But I am further of opinion that, while the claim of Stuart, Buchanan & Co. cannot be asserted upon this bond, yet that is a valid claim, arising upon a contract made with the county court of Dinwiddie, for salt furnished said county, and the claim for which was recognized by said county in writing, and made a matter of record, as shown by the following order:
* Virginia:
In Dinwiddie county court, June 16th, 1873:
Ordered, that the clerk of this court issued a bond for $3,695.30, payable to Stuart, Buchanan & Co., for salt to be delivered by contract, the said bond to be paid the 1st January, 1866, with interest at three per cent, thereon from the 1st January, 1863.
A copy! Teste:
A. C. Winston, C. C.
The record shows that when this order was entered a majority of the acting justices were present. This order is the foundation of a valid claim against the county of Dinwiddie, if the same was presented within the period of the statute of limitations. In a case arising upon a claim to be settled by the board of supervisors, it must be conceded that the time of the commencement of the action is the date of the presentation of the claim before the board. It is proved by incontrovertible evidence that the claim of- Stuart, Buchanan & Co. was presented on the first Monday in December, 1873; which was at a period not barred by the statute of limitations. Mr. Thomas G. Watkins, one of the counsel of Stuart, Buchanan & Co., testified as follows:
On the first Monday in December, 1873, I, as one of the counsel for Stuart, Buchanan & Co., appeared before the board of supervisors of Dinwiddie county. As soon as the board met some member asked what business there was before the board. Some one then presented a long string of small claims against the county. I then got up and told them I had a claim of Stuart, Buchanan & Co., against the county. I unrolled a bundle of papers, took the claim out, *and proceeded to read it aloud to the board. When I had finished, one member of the board (I did not know the name of any of them) asked me whether the amount of three thousand odd dollars was the principal or principal and interest both. I replied it was the principal. One of them asked me if i had the bond. I told h;m I did, and took it out; I also told him I had a copy which I intended to leave with the clerk, and then handed a copy to a member of the board, who I supposed was the president. I then told them I had the orders of the court appointing the agent, &c., and started to read one of them; but had hardly read a sentence of - the order when some member of the board, got up, with a paper in his hand, and announced that a Mr. Carr, a member of the board, had died, read some resolutions, and moved that the board adjourn. I begged them not to adjourn, telling them I had come a long way and did not wish to return; when one of the board said that they had come a long way too, and their convenience ought to be consulted as well as mine. The commonwealth’s attorney; Mr. Epes, then arose and told the board that they had a precedent for adjourning on account of the death of a member; and he hoped they would adjourn, so that he would have time to look into the claim of Stuart, Buchanan & Co. Mr. Epes advocated an adjournment, and I opposed it. After we had been talking for some time, the member of the board who had moved to adjourn renewed his motion. They wanted to adjourn indefinitely, without naming any day. Mr. Epes then proposed some day in February, 1874. I then asked to make it the 15th day of January^ 1874; but Mr. Epes said he did not think it would give him time enough to look into the case. *Finally, however, he agreed to 30th of January, 1874, saying he might be able to get ready by that time.
Before the board adjourned I asked that I might be allowed to spread the papers upon the record. Mr. Epes objected, saying he did not see what good it would do my case. The clerk then said, “I suppose I will be paid for it.” I told him yes. to spread them on the record and send the bill to us, and we would pay for it. He then asked me to put them in the order I wanted them to come on the record. I took a pin and did so, handing them to him. I know that all the foregoing occurred on. the first Monday in December, 1873. I most undoubtedly left with the belief that all the papers would be spread on the record on that day.
This testimony of the counsel prosecuting the claim is corroborated in every essential particular by the clerk of the board of supervisors. He says:
“On the first Monday in December 1873, Mr. Thos. G. Watkins, as counsel for Stuart, Buchanan & Co., appeared before the board of .supervisors, and presented the claim of Stuart, Buchanan & Co., and orders of the court, and insisted upon their considering the claim and spreading it and the papers relating to the same, upon the record of said board. The board refused to consider the matter, and all other claims, but simply passed a resolution in relation to the death of one of its members, and then adjourned. Mr. Watkins left with me copies of the original papers relating to the claim of Stuart, Buchanan & Co., and which are set out in the *173 record of appeal. Mr. Watkins urged upon the board the consideration of the claim that day. and of spreading all the papers upon the record. All the papers were so left with me at that meeting on that day.”
"He further says no entry of the application was made until the 3rd January 1874.
How it is insisted by the learned counsel for the appellant, that it can be shown by the record alone that the claim was presented; and as the record shows that the date of its presentation was 3rd January 1874, it is therefore barred by the statute of limitations. I cannot concur in this view. If the board, by its own fault, prevented the recordation of the claim and the papers to sustain it, it cannot be permitted to take advantage of its own default, to defeat a claim presented in due time; and which ought to have been recorded, and would have been recorded but for its refusal. Under the circumstances the board will be estopped from pleading the act of limitations, and the court will regard the recordation of the claim to have been made when it ought to have been made— when the claim was presented, and the papers sustaining it were delivered to the clerk, to wit: on the first Monday in December 1873.
I am therefore of opinion that the claim of the appellees was not barred by the statute of limitations.
The decision of all the preliminary questions brings me to consider the case upon its merits.
This contract of Stuart, Buchanan & Co. with the county of Dinwiddie, for furnishing salt during the late war, like those cases known as the Salt cases, decided by a divided court at the last term, all have two features in common. They all arose out of contracts made by the several counties named, under an act of the legislature of what is called the Richmond government, in contradistinction of what is known as the restored government of Virginia, and which was passed during the war, to wit: on the 9th May 1862. They all are denounced in common, as contracts unlawful *and invalid, because made and entered into for the purpose of aiding (the so-called) rebellion against the United States, and therefore void under the constitution of the restored government of Virginia.
The authority under which the contracts now sought to be enforced were made, is an act of the legislature assembled at Richmond, passed May 9th, 1863, entitled “An act to authorize the comity courts to purchase and distribute salt amongst the people and provided payment for the same;” and is in the following words:
§ 1. Be it enacted by the general assembly. that the courts of the several counties of this commonwealth, when a majority of the acting justices of the county is present, or when the justices have been summoned to attend to act upon the matter, are hereby authorized and empowered to order the purchase for the use of the people of said counties respectively, such quantities of salt as the said courts may deem necessary, and to provide for the payment of the same by county levies, or by loans negotiated upon the bonds of said counties, to be redeemed by county levies or otherwise.
§ 2. The said courts shall have power and authority to distribute the salt thus purchased amongst, or dispose of the same to, the people of their respective comities, in such quantities, upon such terms, and under such regulations as the said comities may prescribe.
§ 3. P'or the purpose of carrying out the provisions of this act, the said court may appoint or employ agents or commissioners, and take from them bonds with approved security, payable to their respective counties, in such penalties as such courts may prescribe, "with condition for the faithful performance of their duties as such agents or_ commissioners. The bonds so taken shall be filed in the clerk’s office of the court in which they are taken, and may be put in suit from time to time, by the said court in behalf of the said counties, or by any person injured by the breach of the said conditions.
§ —. This act shall be in force from its passage.
It was under this act that the contracts in the case before us, and those known as the Salt cases, are now sought to be enforced.
The learned counsel for the counties assail these contracts upon two grounds (common to all the cases). First, That the act of the legislature under which these contracts were made, was the act of a pretended legislature of an unlawful and usurped government; and that therefore all contracts made under this pretended authority of such legislation were illegal and void. Second, That all such contracts come within the prohibition of the present state constitution, which declares that “no county, city or corporation shall levy or collect any tax for the payment of any debt contracted for the purpose of aiding any rebellion against the state or the United States.” Art. 10, sec. 10 Const.
These are the two grounds upon which these contracts are assailed by the counsel representing the different counties.
As to the first position upon which counsel claim that these contracts cannot be enforced, viz: that the contracts were made under the pretended authority of an unlawful and usurped government, it is sufficient to say that the Richmond government (so called), as well as the Confederate government, of which it *formed a part, have been repeatedly recognized by this court, by the supreme court of the United States, and by the legislature of the restored government, as at least having all the attributes of a government de facto. Walker v. Christian, 21 Gratt. 291, 302; Walker v. Pierce, 21 Gratt. 722; Newton v. Bushong, 22 Gratt. 628; Ruckman v. Lightner’s ex’ors, 24 Gratt. 19; Texas v. White, 7 Wall. U. S. R. 702, 733; Thornington v. Smith, 8 Wall. U. S. R. 1.
In Walker v. Pierce, Judge Anderson, speaking for the whole court, and referring to an act of the legislature passed in 1863, in reference to Confederate currency, says: “The plaintiff contends that this act has no force *174 or'validity as a law. I do not concur in that opinion. It was the act of the legislature of the _ state, which had the power to enforce all its enactments. It had the force and effect of a law of the state, and was as obligatory on the citizens of the state as is any law passed by subsequent legislatures.”
The opinion of Cheep Justice Chase, in Texas v. White, is as applicable to that portion of this state now recognized as Virginia, as it was to the state of Texas. He says, page 733, “And yet it is an historical fact, that the government of Texas, then in full control of the state, was its only actual government; and certainly if Texas has been a separate state, and not one of the United States, the new government having displaced the regular authority, and having established itself in the customary seat of power, and in the exercise _ of the ordinary functions of administration, would have constituted, in the strictest sense of the words, a de facto government; and its acts, during the period of its existence as such, would be effectual, and in almost all respects valid. And to some extent this is ■ true of the actual government of
*Texas, though unlawful and revolutionary as to the United States,
It is not necessary to attempt any exact definition within which the acts of such a state government must be treated as valid or invalid. It may be said, however, with sufficient accuracy, that acts necessary to peace and good order among citizens, such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating j¡he conveyance and transfer of property, real and personal, and providing remedies for injuries to person or estate, and other similar acts, which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government.”
See also Thornington .v. Smith, 8 Wall. U. S. R. 12; Sprott v. United States, 20 Wall. U. S. R. 459; Huntington v. Texas, 16 Wall. U, S. R. 402; Evans v. City of Richmond, Johns. Rep. Ch. J. Chase’s Decisions 551; Thomas v. City of Richmond, 12 Wall. U. S. 349, 357.
Upon these authorities, as well as upon the general principals of international law, recognized by all writers upon the subject, from Grotius, its father, down to Wheaton and Phillimore, its latest expounders, the government, which had its seat at Richmond during the late civil war, was at least a government de facto, and all its acts in the ordinary administration of law, and in the interests of civil society, and for the protection of civil rights, were valid, and all contracts, arising out of the laws of such a government will be enforced, after the restoration of peace, to the extent of their just obligations unless it be shown that such laws were enacted, or contracts entered into, “for the ^purpose of aiding any rebellion against the state or against the United States.”
Such laws and contracts are not only dedared valid and binding by the decisions of this court and of the supreme court of the United States, but by the express statutes of the restored government of Virginia— whose constitutionality or validity have never been questioned in this court or elsewhere.
On the 28th February, 1866, an act was passed by the legislature of the restored government, the very object of which, as shown by its title and preamble, was “to give effect to certain acts, contracts and proceedings during the late war.”
After reference to the existing and actual supremacy of the Confederate government and the state government as a part of it, it provides as follows: “And whereas doubts may arise whether any, and what acts, contracts and proceedings, done, made and had, and whether any, and what rights and titles acquired under the authority, or supposed authority, of the said governments, or either of them, are valid and effectual: Now, therefore, for the better protection of the people, and for preventing and settling such doubts,
“Be it enacted by the general assembly, that all contracts and agreements of every kind and nature whatsoever, whether executory or executed, all marriages, and all acts and proceedings whatsoever, made, done or had, and all rights and titles of every kind and nature whatsoever, accrued to or acquired by any person, under the authority of either of the governments aforesaid, or of any law established and recognized thereby, * * * and not inconsistent with the constitution and laws of the United States, or with the constitution of this state, and all such contracts *and other acts and proceedings made, done or had, and rights and titles acquired, by any person under the authority of the said state government or the laws established or recognized thereby, * * * shall be held and taken to be. and to have been, at all times, of the same force, virtue and effect, in all respects, and none other, as if no question had ever been made as to the lawful authority of said governments, or either of them.”
Thus it appeared that by an express enactment of the legislature of the recognized lawful and restored governments, all contracts made, and rights and titles acquired, under the authority of the Richmond government, or of laws established and recognized thereby, are expressly recognized as valid and binding, unless “inconsistent with the constitution and laws of the United States, or with the constitution of the state.”
I come now to notice the second ground upon which the validity of the contracts under consideration is assailed by the learned counsel representing the counties in these suits, to wit: “and all these contracts come within the inhibition of the state constitution, which declares that 'no county, city or corporation shall levy or collect any tax for the payment of any debts created for the purpose of aiding any rebellion against the state or against the United States.’ ”
The question we have to determine is, *175 were the debts contracted by these counties, in the purchase of salt for the use of its citizens, ‘‘created for the purpose of aiding any rebellion against the state or the United States?”
1st. Was there anything- in the act itself which conferred the authority to make these purchases, which makes it liable to the objection that it was passed for *the purpose of aiding any rebellion against the state or against the United States?
It has already been shown that it was a legislative act of a government de facto, and is as operative and valid as if it had been the legislative act of a government de jure; provided it is not subject to the objection that it was passed for an unlawful purpose. Certainly no such unlawful purpose is indicated upon the face of the act, either from its object or express terms. Its title indicates its purpose: “An act to authorize the county courts to purchase and distribute salt amongst the people, and provide payment for the same.” Surely this is a lawful purpose. It cannot be held that the motive and object of the legislature in passing such act was unlawful and treasonable. The courts will not impute unlawful motives to the legislature where the terms of the act do not disclose the unlawful purpose. As was said by Judge Denio, in People v. Draper, 15 N. Y. 533, 545: “If a given act of legislation is not forbidden by express words or by necessary implication, the judge cannot listen to a suggestion, that the professed motives for passing it are not the real ones. If the act can be upheld upon any views of expediency or public policy which the legislature may have entertained, the law cannot be challenged in the courts.” See also People v. Shepard, 36 N. Y. 285, 289. The same doctrine is recognized by this court in Dearing v. Rucker, 18 Gratt. 427, 437, where it is said by Judge Joynes, “Whatever we may speculate about the real purpose of the legislature, we must, if the language will allow it, impute to them a lawful purpose, and put such a construction upon the act as will make it consistent with the supreme law.”
Adopting this rule of construction, it is plain that both the act itself, and the contracts made under it, -‘‘were not unlawful. If these debts had been created under the authority of a lawful government (I mean lawful in the sense of the decisions of the courts), no question could have been raised as to their validity. And the true test of their validity is, were they enacted “for the purpose of aiding any rebellion against the state or against the United States.”
The purpose of the act was “to furnish salt to the people of the commonwealth,” not to soldiers in armed rebellion against the state or the United States, but to the people of the commonwealth — women, children, old men, non-combatants, slaves — all which make up the people of the commonwealth. This article of prime necessity, absolutely requisite for the preservation of human life and animal life, was to be furnished and distributed by the terms of the act through agencies of the civil government, and not the military. Neither military officers were called upon, nor military orders issued, to effect its distribution. It was distributed to the people through the civil courts, which had their existence and regular constitutional organization long before any “rebellion” was dreamed of; and it was the agents of those courts, and not of the military authorities. then at war with the United States, through whom these bounties of charity and humanity were dispensed to the people of the commonwealth. It is true that supplies of salt to the people preserved life and promoted health, and thus enabled them the better to resist invasion, and to carry on the war then waged between the north and south; and in this sense may be said to be remotely and indirectly in aid of the rebellion. The same may be said of every act of charity, of humanity and self-preservation done during a civil war. If I gave to a starving soldier a crust of bread or a cup of cold *water — if a mother nursed and watched beside her sick or wounded son, seeking by her tenderness and care to restore him to health and strength — if amid the sickening horrors of the hospital and the prison angels of mercy were ministering to the suffering and the dying, and a single soldier be rescued from death — or a single wounded man is healed and sent back to the ranks — “aid” is given remotely and indirectly “to the rebellion.” Are such acts as these — dictated by the instincts of nature and the appeals of our common humanity — to be denounced as unlawful and treasonable? Does the existence of a civil war loosen the bonds of society and destroy all natural and civil rights? Are the horrors of war to be increased and intensified by a total suspension of the administration of laws? Must anarchy rule supreme because a people are engaged in civil war? Does the maxim, "inter arma leges „silent,” mean that all the laws of society and of self-preservation are to be silenced, and all natural rights and civil rights be destroyed, or yield to the laws of war?
Society has a right to protect itself. A state must provide for the health and the lives of its citizens. In doing this it but conforms to the law of nature and the law of God. “The law of nature,” says Blackstone, “being coeval with mankind, is supreme in obligation to any other. No human laws are of any validity if contrary to this.”
“The law of England (says Broom in his Commentaries on the Common Law), whether statutory or customary, professes lo act in accordance with, and to be regulated by. certain great fundamental principles. It professes to act and adjudicate conformably to the law of nature, the law of God, to common sense, to legal reason, to justice and humanity.”
*The enlightened jurisprudence of every civilized country recognize and enforee these doctrines. They have been repeatedly declared even by that tribunal (the supreme court of the United States) which would be very slow to legalize or validate any act intended to give aid to the rebel- ' lion.
*176 In Texas v. White (supra) Judge Chase said: “Acts necessary to peace and good order, * * and other similar acts (and surely acts for the preservation of the health and life of the citizen come within the category), which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government.”
In Evans v. City of Richmond (supra) the same judge said: “In Texas v. White, the supreme court held that the acts of a body exercising authority in an insurgent state as a legislature must be regarded by the United States as either valid or not according to the subject matter of legislation.”
Again he says in the same case: “As to regulations concerning marriage, descents, conveyances of property — everything, in short, which belongs to ordinary business and the common transactions of life — its acts may be upheld as valid. But, on the other hand, those acts which were intended to give a sanction to proceedings of any body, corporate or otherwise, which would have a tendency to subvert the authority of the United States, cannot be so regarded.”
In Thomas v. The City of Richmond, 12 Wall. U. S. R. 349, 357, Mr. JTustice Bradley, declaring the unanimous opinion of the court, says: “Laws made , for the preservation of public order (and a fortiori for the preservation of life and health), and for the regulation of business transactions between man and man, and not *to aid or pro'mote the rebellion, though made by a mere de facto government not recognized by the United States, would be so far recognized as to sustain the transactions which have taken place under them.”
In Thorington v. Smith (supra) it was declared that “transactions in the ordinary course of civil society, though they may indirectly and remotely promote- the ends of the unlawful government, are without blame, except when proved to have been entered into with the actual intent to further insurrection or rebellion.”
The supreme court said in Huntington v. Texas, 16 Wall. U. S. R. 402, if the bonds in controversy “had been issued and applied to the support of schools, or the maintenance Of asylums for the insane, for the deaf, mute or the blind, or to other purposes equally legitimate, the presumption would be in favor of the holders of the bonds, and not against them.” * * * Whether the alienation of the bonds, by the usurping government, divests the title of the state, depends on other circumstances than the quality of the government. If the government was in actual control of the state, the validity of the alienation must depend on the object and purposes of it. If that was just in itself and laudable, the alienation was valid.
In conformity with these principles, so often and clearly defined by the decision of the supreme court of the United States, as well as by this court, it was perfectly competent for this de facto state government to pass the act of May 9th, 1862, under which those debts were created. The act itself makes no reference to war or state defence; its subject matter is in the interests of humanity and the preservation of society itself. Its professed object, as shown in its title, is to give relief to the needy, helpless, non-combatant people, and not to the maintenance of a military *force. These professed motives being not only innocent, but commendable', we ought not to entertain a suggestion that these were not the real motives. Every presumption will be made in favor of a lawful purpose. It must be proved that the actual intent in the passage of the act was “to promote the rebellion.” and that these debts were created for tfie purpose of aiding rebellion against the state or the United States. In these cases no such intent is proved; but, on the contrary, it is plain that the act was passed for the lawful and humane purpose of furnishing to the people that article of pure necessity, without which all human life and animal life must perish. It matters not that the scarcity of salt was produced by the war. Whether by war, or pestilence, or famine, or earthquake, or flood, or fire, or any other great calamity; if this great necessity for the preservation of health and of life existed, it was the duty of the state to supply it to its citizens; and every contract made for this lawful and humane purpose is as legal and valid, as sacred and binding, as any contract ever enforced in a court of justice.
I should say therefore, both upon principle and authority, that the obligations assumed by the counties for the purchase of salt, under the act of May 9th, 1862, are valid, and must be enforced.
Now at this "point, before entering upon a discussion of further views enforced by the learned counsel for the appellant, with much ingenuity and ability, I desire to say, in justice to my brother Anderson, that in the opinion I wrote, after the adjournment of the court, carrying out my oral opinion, delivered from the bench in the cases known as the salt cases, decided by a divided court in 1876, I unintentionally gave to his language an interpretation not intended by him. From *his explanation afterwards, I am satisfied I had misconceived his meaning, and I now take pleasure in repairing any injustice which may have been done him in the course of that opinion arising from such misconception; but I am constrained to say, most respectfully, that his views, as modified and explained, do not meet my concurrence, and admitting his premises to be correct, would lead my mind, to a contrary conclusion.
But it is urged by the learned counsel for the appellant, in his petition of appeal, that “the present county of Dinwiddie if a different county organization from that whose agent contracted the debt', and is no wise bound therefor.”
If I'understand this position it is this— that the counties which made the contracts are no't the same counties which are now called upon to meet them by payment. How have they lost their identity? When and where?
The state has certainty not lost its identity *177 by the events of the war. That it has not has been solemnly decided by this court. In Higginbotham’s ex’x v. Commonwealth, 25 Gratt. 627, the lamented Judge Bouewn, speaking for the whole court said, page 635, “Virginia has not lost her identity by the loss of forty-eight counties and the inhabitants thereof. Impoverished, crushed and dismembered, like a multitude of her faithful defenders, she is Virginia still, and so 1 trust she will long remain. 1 am wholly unwilling to admit that her identity has been lost.”
_Now if dissolution cannot be predicated of the state, how can it be of the counties? Can the state live and the counties perish? Can the state “remain the same” and the counties change — can the state retain it£ identity and the counties lose their identity ?
*What is meant by the declaration that there is “a want of identity between the contracting party and Ihe paying party?” The contracting party is the county of Dinwiddie in January 1862. is not the county of Dinwiddie tbe same county in January 1862 as in January 1866 or in January 1876. Surely it will not be contended that its identity is destroyed because its citizens in 1862 are not the same m 1866 or 1876. If any change in the actual residents of a county could destroy its identity, it would lose its identity every day. The county of Dinwiddie continues to be the county of Dinwiddie, however its inhabitants may change either by increase or decrease. It is the identical county now that it was before any of its inhabitants were born. This court has more than once decided that not even an excision of a part of its territory and incorporation of a part of its inhabitants with another county or municipality destroys the identity of a county. Harrison Justices v. Holland, 3 Gratt. 247; Wade and others v. City of Richmond, 18 Gratt. 583. Within a few years past one-third of the population of the county of Henrico has been incorporated with the city of Richmond. Surely no one will contend that thereby the county of Henrico has lost its identity. It is still the same county that it was before. How can it be said, then, that the county of Dinwiddie as it stood in January 1862 is not the same as it stands at the present day. Its territory is the same, its population is but little changed, and substantially the same body of laws govern it now as in 1862.
The declaration that there is “want of identity” between the counties during the existence of the war and after its close is a declaration in another form that the counties perished or lost their identity during the war. It is admitted that the states did not; and a *fortiori the counties did not. If the state retained its identity, the counties a fortiori remained the same. But if by the argument that there is a “want of identity between the contracting party and tlie paying party” it is meant to assert that a county within the territory of a state, while it was one of the Confederate States, is not the same county after that state lias, by the destruction of the Confederacy, been restored to the Union, then all 1 have to say is, why is it that in the cases involving the same question, decided by this court and by the supreme court of the United States, no such ground has ever before been even hinted at either by court or counsel.
In Jones v. City of Richmond, 18 Gratt. 517, the city of Richmond made during the war, upon the eve of the evacuation, a contract to pay its citizens for all spirituous liquors which as a measure of peace and order, it was deemed necessary to destroy. This contract was enforced after the war. Ft was never hinted that the city of Richmond which made the contract was not the same city of Richmond which was required to pay the damages. There was the same “want of identity” between Richmond during the war and Richmond after the war as there was between the county of Dinwiddie during the war and the county of Dinwiddie after the war. So in the case of the Town of Danville v. Pace, 25 Gratt. 1, the bonds, the subject of controversy, were issued by the town of Danville during the war. Judgment was given upon these bonds after the war, which was affirmed by this court. It was never suggested by court or counsel that there was any “want of identity” between Danville during the war and Danville after the war, or that these contracts made by these towns during the war could not be enforced against them after the war. In both *cases the court was unanimous. See also Miller & Franklin v. City of Lynchburg, 20 Gratt. 330, in which Judge Anderson delivered the opinion of the court. So in the cases of Evans v. City of Richmond and Thomas v. same (supra), it never was hinted by Chief Justice Chase or Mr. Justice Miller, who delivered the opinion of the court in these two cases respectively, that the City of Richmond which issued the “small notes,” the subject of controversy, was not the same city of Richmond against which payment was to be enforced; but the case turned upon the ground that the purpose for which they were issued was unlawful, because in aid of the rebellion.
The fact that these suits were brought against municipalities can make no difference. The counties must be governed by the same principles which control these cases.
The argument that these contracts must now be declared invalid, because the county of Dinwiddie is a different county from that which made the contract, is but another form of asserting the proposition, that the counties and county courts during the war had no power to bind the counties or their people after the war. What are the consequences which would flow from the establishment of such a doctrine? Have they been seriously considered? What becomes of the judgments of the county courts of that time? Are they binding now? Or was there such a want of identity between the county courts that pronounced the judgments and the county courts of 1866 that the latter could not enforce them Are the roads which the county courts established in 1862 no public roads in 1866? Are the amounts awarded for condemnation *178 in 1862 collectable now? Are the roads which were discontinued by county courts in 1862 still public *roads, notwithstanding their alleged discontinuance? Are the probates which they allowed during the war valid now? Are the wills which they admitted to probate then valid instruments now? Are the deeds recorded in the clerks’ offices of these courts legally recorded? Are the recognizances taken enforceable now? Are the administrations which they committed to the hands of sheriffs, administrators and executors lawfully in the hands of these parties now? Are the levies which they laid unlawful; and can the aggrieved citizen recover the unlawful tax he has paid? Are the bonds of public officers taken by these courts invalid and no longer binding? How can these questions, and a hundred others, be answered, if it be true that the counties of this state lost their identity during the war, and are not the same counties now that they were during the war? Are not these questions all solved in the confirming act of February 28th, 1866? And was it not the very purpose and obje'ct of that act to remedy the very evils which would arise from the doctrine 'asserted? The whole scope of the act is to carry out what its title asserts — “to give effect to certain acts, contracts and proceedings during the late war.” So even if it beitrue that the counties now are not the same counties which made the contracts (to. which I utterly dissent), yet, under the express terms of the confirming act, these contracts are still binding upon the counties and people thereof.
Public necessity, public morals, and the interest of good government require that this court shall carry out and firmly maintain the confirming act of 1866, passed by a legislature of our wisest and best men, at a period when anarchy would follow war, and when it required the voice of law to" dispel chaos and reproduce order.
*It is impossible to estimate the disastrous consequences which would flow from a failure to carry out and enforce these wise enactments.
Titles would be "destroyed; estates would be ruined; probate of wills would be invalid; the acts of administrators, executors, and guardians and other fiduciaries would be mere nullities. The bonds of matrimony would be dissolved, or marriage made adulterous and offspring illegitimate; the punishment of felons would be made false imprisonment or their execution murder: In a word, the bonds of society would be loosened and anarchy would reign supreme.
But it is further argued by the learned counsel for the appellant, that this and like debts were created in consequence of secession, and grew out of the war. and cannot therefore now be enforced; that the action of the county court to supply the people with salt was rendered necessary by the war, and was necessary to encourage and strengthen" the people to maintain the war for the establishment of the Confederacy.
This is carrying the doctrine far beyond that declared by the Federal courts. If anything is settled by the decisions of the supreme court of the United States, it is that the validity of the legislation, or other acts during the war, depends upon the character of the act, and not upon the fact that the particular legislation was consequent upon the events of the war, or flowed from the actual condition of things. The Federal tribunals have always applied the test ,to the act which was done, or the legislation which was enacted, and have never- stigmatized any act. or any legislation with illegality, merely because secession made it necessary, or because, if there had been no secession, the act would never have been done. Will *our courts establish a more stringent or sweeping rule than the Federal courts?
The only case relied upon by the learned counsel to sustain this position, is that of Leake v. Com’r of Richmond, 64 North Car. R.; opinion of Chief Justice Pearson since overruled.
This is the only case referred to, to sustain the view suggested; and this case is opposed by the whole current of decisions -in the Federal courts, in this court, and in the courts of Tennessee, Alabama, Mississippi and Texas.
I am the more confirmed in my opposition to these views of the learned counsel, because their logical conclusion and legitimate results would inevitably tend to a repudiation of all debts, public and private, contracted during the war. Why should not the same'principle be applied to a debt contracted by an individual during the war, as to a debt created by a corporation?
If a contract, made by a corporation, which “was rendered necessary by reason of secession,” cannot now be enforced, why should we enforce against individual contracts which also “were rendered necessary by reason of secession?” Was not the debt enforced in the case of Mann v. Dozier, 24 Gratt. 1, a contract which “was rendered necessary by reason of secession?” Are not all suits upon bonds given to substitutes which have been enforced since the war, suits upon contracts “rendered necessary by reason of secession?” Could it not be said, indeed must it not be said, ef all .contracts made for the payment of Confederate money, that they “were rendered necessary by reason of secession,” and that “had there been no Confederacy, no such contract could have been made?” And yet we know that such contracts, by the thousand. *have been enforced by this court and by every other court in the commonwealth. We hold that the contracts of individuals “which were rendered necessary by secession,” and which would never have been made “had there been' no Confederacy,” are binding and valid. How can we say that when such contracts are made by corporations and counties (which are quasi corporations), that they are invalid and void. There is no difference in principle. And indeed this court, at its last term, held *179 that a corporation (the Eastern Lunatic Asylum) was bound for a claim which originated during the war, and which never could have arisen “if there had been no secession,” and no “Confederacy.” See Eastern Lunatic Asylum v. Garrett, 27 Gratt. 163. I can see no reason why a different rule is to apply to corporations than to individuals. I would excuse neither from the payment of their just obligations, if lawful in themselves.
The constitution itself makes a distinction between contracts made by the state while under the dominion of the Confederate government and those made by cities, counties and corporations. Payment of the former is expressly prohibited; but payment of the latter is only prohibited when they are debts created for the purpose of aiding any rebellion against the state or the United States.
The constitution makes no other inhibition. The very distinction which it makes between debts created by the state and those created by counties and corporations, shows that whenever such debts are lawful in themselves they may still be enforced. It does not prohibit payment of such as “were rendered necessary by secession,” or such as would not have been contracted “if there had been no secession and no Confederacy;” but the inhibition is against the payment *of all debts “created for the purpose of aiding any rebellion against the state or the United States.” Unless it comes ■wiffein this category it is a lawful contract and mast be enforced. I cannot add another prohibition which the constitution does not recognize.
These considerations lead my mind to this conclusion: that whenever it appears from the facts clearly proved, or from fair i and legal inferences from the facts, that the contract of the parties was made “for the purpose (that is, with the intent) of giving aid to any rebellion against the state or the United States,” I should declare the contract invalid and void; but where this does not appear, I should uphold and enforce it; and. as I have already indicated, that a contract made by counties and corporations under act of May 9th, 1862, is not subject to the inhibition of the constitution, but is lawful and valid and must be enforced.
The counsel for the appellant' relies strongly upon the cases of Chalkley v. Commonwealth, 20 Gratt. 404, and De Rothschild v. The Auditor, 22 Gratt. 44, as ruling this case.
The argument is based upon an_ entire misconception of the principles decided in those cases; and they have no application to the case before us. In those cases it was held that the present state government (the restored government, so-called) was not the successor of the Richmond government, and was not responsible for debts contracted by that government; and that the present state government was inhibited by express terms of the constitution, from paying any debt contracted by the Richmond government during the war. Art. 10, sec. 10.
This positive inhibition of the constitution must be observed: but the same scction only prohibited the ^payment by counties and corporations of such debts as were created for the purpose of aiding the rebellion.
I am of opinion, for the reasons herein stated, that the contract of the county of Dinwiddie with Stuart, Buchanan & Co., for furnishing salt to the people of that county, during the late war, was a lawful contract, and must now be enforced.
But I am further of opinion, that said contract was one solvable in Confederate currency, and should be scaled to its value in gold at the date of the contract, to wit, on the 29th May, 1862.
Anderson, J. The contract in this case, it is claimed, was made by authority of an act of the Confederate state of Virginia, passed May 9th, 1862. Unless the power was vested in the county court by an act of the legislature, it could not bind the people of the county by contract.
The county court is invested with judicial power by the constitution; but not to make contracts for the county, or the people of the county. It is in no proper sense, the representative or agent of the people; was never constituted such by the voice or act of the people; and can only be authorized to bind the people by act and authority of the legislature of the state'. It is a delegated power.
Was the contract in question made pursuant to the authority given by the Confederate legislature? The first section, under which the authority is claimed, is as follows : County courts are “authorized and empowered to order the purchase, for the use of the people of said counties respectively, such quantities of salt as the said courts may deem necessary, and to provide for the payment of the same by county levies, or by loans negotiated upon the bonds of said counties, to *be redeemed by county levies or otherwise.” Upon a fair construction of this act it was evidently intended by the leg' ’ature in vesting this power in the county courts to contract for the purchase of salt, to invest them also with power to provide for its payment; and it was evidently contemplated that when providing for the purchase, the county courts should at the same timg provide for its payment by making a levy; or, if they determined to purchase for cash, and to raise the money by negotiating a loan on the bonds of the county, they were at the same time required to provide for the redemption of the bonds, by a levy, “or otherwise." The second section authorizes them to dispose of the salt to the people of their respective counties, under which clause they had authority to sell the salt to the people of the county for cash; as the county court of Dinwiddie county did. And in that case they might have met the requirement of the 1st section, in providing for the payment, by requiring the proceeds of the sales, to be applied to the redemption of the county bonds, or in paying directly for the salt, if no bonds had been issued; or if there was any better mode, in their opinion, by the terms “or otherwise,” they were authorized to adopt it. *180 But the provision for payment, whatever in their discretion they might adopt, was to be made when they ordered the purchase, and not to leave it to their successors to levy, and future generations to pay for it. And this, it seems to me, is a qualification ■of the power to purchase, with which they were_ invested by the act. I do not think it was intended or contemplated by that legislature, to invest the county courts that made the contract, with power to bind future county courts, and certainly not county courts which were subordinate to the government of the United States, to order *a levy for their payment, after the Confederate legislature, from whom the power emanated, had become extinct. That legislature itself had no power to invest them with such authority.
If this construction is correct, then to order the purchase of salt, upon the bond of the county, payable at a remote period, reaching beyond the probable- continuance of the war, without providing in any way for its payment, as was done in this case, was a violation of the spirit, if not the letter, of the law. It was a speculation, in which it was not in the power of the county court, under this act, to involve the people of the county. And as the appellees co-operated with the county court in thus abusing, if not exceeding its authority, indeed it appears to have been done at their instance and request, they ought to bear the consequences; and the present population of Dinwiddie county .ought not now be subject to a levy to pay for salt which the people of the county, at the time they received it from the agents of the county, paid for in cash. But if I am mistaken in this view, and the acts of the county court of Dinwiddie in relation to the contract in question were in conformity with and in pursuance of the act of the Confederate legislature relied on, the contract ought not to be enforced on other grounds which I will not consider.
I do not hold that the legislature which passed the act aforesaid was a pretended legislature of “an unlawful and usurped government.” To the contrary, I am of ■opinion that it was the legislature not merely of a de facto, but of a de jure government; and that all its acts within the limits of its authority, under the constitutions of the state and the Confederate States, were valid and binding on the citizens of Virginia until the fall of the Confederacy and the submission of the *state to the power of the United States; and that then such of its unexecuted acts of legislation and administration as were the result of secession, and in the interest of the Confederacy, and for its support and maintenance in its resistance to the power and authority of the United States, became inoperative and void. I have, therefore, no fault to find with the decision in Walker v. Pierce, 21 Gratt. 722, and see no cause to change or modify the opinion I gave in that case.
By the ordinance of secession the seceding states dissolved their relations with the Federal government and the other states of the Union. The states thus withdrawing from the Union, entered into new political relations with each other, forming a political entity, or body politic, known as the Confederacy, which they invested with powers of sovereignty, for their government and protection.
The government of the United States refused to acknowledge the right of the states thus to dissolve the bonds of union, to absolve themselves from their obligations tc the Federal government, and to form a confederation independent of the Union; and resolved' to resist it with arms.
The Confederate States resolved to maintain their right to withdraw from the Union to form a new Confederate government for themselves, .and to resist force with force. Then ensued, the most gigantic and bloody war of modern times.
The Confederate States, after a brave and gallant resistance, for a period of four years, were obliged to succumb from exhaustion, to a power so vastly superior in numbers, and material resources, whose navy covered the seas, and whose armies were recruited from the four quarters of the globe, and whose arsenals *and commissariat were furnished by a world-wide commerce. During the four years existence of the Confederacy, a currency was created, based alone on faith in the Confederacy, which became the almost exclusive circulating medium of all the states within its limits and under its control. And contracts were entered into by the Confederate, and state governments of the Confederacy, and by the counties and municipalities of the Confederate States (such as the contract sought to be enforced' in this case) with individuals and corporations which were not fulfilled before the overthrow of the Confederacy. These contracts are vast in amount, and various in character. There are contracts which were made with the Confederate government itself, through different agencies. There are contracts made by state governments of the Confederacy, in diversified forms. And there are contracts made by counties and municipalities of the states in the Confederacy, under authority of laws passed by a Confederate state legislature. These are large in amount, and relate to diversified subjects. Many of the counties and municipalities, during the war, under authority of acts of the legislature," issued promissory notes, which were designed to supplement the circulating medium, vast amounts of which are still outstanding and unredeemed. Many of the counties under the same authority borrowed Confederate money, to be used in the purchase of supplies for soldiers and soldiers’ families, or for the poor generally; or for the purchase of salt for sale or distribution to the people of their several counties, or entered into contracts for the purchase of salt. These were of no higher / obligation than either of the former. All these acts of the legislation and administration, whether *by the state, or by the counties, by authority of the state, were binding at the time. But a grave question arises, are they operative now, and can they be enforced after the Confederacy has ceased *181 to exist, and has no representative or successor? Or have those contracts which were made in the interest of the Confederacy, and for its support and maintenance, by the members of the Confederacy, or the subordinate political divisions of the Confederate states, by authority of the states, like the contracts made directly with the Confederate government — the head — become extinct by the death of the Confederacy, without a successor or representative?
It is true the states are indestructible, whilst the Confederacy was transient. It had but a fleeting existence, though it has left its impress on the world's history, which will be ineffaceable by time. But the states remain —though not as Confederate States, nor as a part and parcel of the organized system of resistance to the power and authority of the United States; but as constituents of the United States. They have abrogated and annulled their acts of secession, and have yielded to the demands of the Union, and are a part of it. Is there not an incongruity in holding them, the states or the counties, in the courts of the United States, state or federal, bound to fulfil contracts which were entered into by them as members or parts of a Confederacy which was organized in resistence to the power and authority of the United States, for the support and maintenance of that Confederacy, after they have been reduced to submission to the power of the United States, and have been rehabilitated in the. government of the Union?
I do not believe that a precedent can be found in the history of civil wars amongst civilized nations, *or of wars between federal states, of the successful belligerent undertaking to pay the war debt of the conquered party contracted in resisting' its authority. We have been referred by counsel in argument to the civil wars and revolutions in England, and were told that the monarchy under Charles II undertook to pay the debt contracted by Cromwell. We are told by the historian hume that the great debts of the republic were thrown upon the king after the restoration (Hume’s History of England, vol. vi., p. 366, edition-), but not the war debt which was contracted by parliament in the subversion of the regal power which was now restored in the person of Charles II. It is much more likely that the debt contracted by Charles 1 in the maintenance of the throne would have been assumed by the government which was restored in the person of his son. Indeed I think it will be found that any debts contracted by the king in his unsuccessful and unhappy resistence to the power of parliament were never assumed and paid by the republic under Cromwell which succeeded the monarchy. I think it will also be found that William and Mary, who by a successful revolution soon after the death of Charles 11 were raised to the throne, from which Janies IT, his successor, was expelled, never undertook to pay the debts contracted by James in the wars waged by him in his fruitless efforts to overthrow their government and to regain what he had lost.
Nor can it be maintained, I think, that the government of the United States was bound to assume and pay the debts contracted by the states or counties of the Confederacy in resisting its authority. And if not, the states which compose the United States and which are constituents of that government, and the subdivisions of the states, the counties, which are in *the protection of the United States government and owe obedience to its constitutions and laws as supreme, are not bound to pay such debts.
If it were competent for the county courts, during the war and when they were subordinate to the Confederacy, to bind the present county courts, which are subordinate to the Union, to make a levy for the payment of debts contracted by them, not in the ordinary course of legislation or administration, but which became necessary by reason of secession and the organized resistance to the power and authority of the United States, and for its maintenance, then we have the anomaly of a county court attached to the Union and a part of it, and subordinate to it, levying a tax on citizens oí the United States to pay a debt, which was contracted by a county court of the Confederacy, for citizens of the Confederacy, in the interest of the Confederacy, and to maintain it in its hostility to the United States. Such an auomalv can find no support in reason nor in the laws of nations.
The county court, as we have seen, is not the agent or representative of the people of the county to bind them by contract. If it has such power it is a delegated power, and can only be delegated to it as the organ of a quasi corporation by the sovereign legislative power of the state. The county, as a quasi corporation, is a political entity, which exists only in contemplation oí law, and must derive its character from the law which gives it such existence. It was, prior to the 37th of April 1861, a quasi corporation of the Union, because it derived its corporate character from the laws of a state which was a member of the Union, and it owed obedience to the constitution and laws of the United States as the supreme law of the land. It then ceased to be a corporation *of the Union, because the people of Virginia, in convention assembled, on that day passed an ordinance repealing and abrogating the ordinance of 3788, which ratified and adopted the constitution of the United States, and declaring that the Union between the state of Virginia and the other states of the Union, under that constitution, was dissolved, and that said constitution was no longer binding on any of the citizens of this state; the said ordinance to take effect as of that day. when ratified by a majority of the people of the state. It was submitted to the people, and the vole was taken by counties, and it was ratified by a majority of about one hundred and thirty thousand. The counties were represented in the convention, and after the said ordinance was thus ratified by the people, they ceased to be corporations of the Union as long as said ordinance was in force.
On the 19th of July following the conven *182 tion passed another ordinance ratifying and adopting the constitution of the Confederate States, and declaring that it was binding on all the people of the state; and on the 1st of July “ordained that wherever the words ‘United States’ occur in the constitution, Code or other laws of Virginia, the words ‘Confederate States’ shall be and are hereby substituted therefor when applicable.” Thence forward the quasi corporation of the counties, which submitted to and ratified the ordinance of April 17th, 1861, was a Confederate quasi corporation, so far as it was subordinate to, and acted for, and in the interest of the Confederacy, until the Confederacy became extinct, and the ordinances aforesaid were abrogated. See the Historical Synopsis, Code of 1873, page 1.
For as a political entity of the Confederacy, its breath of life was imparted to it by the Confederate ^States to which it belonged. And the power which was vested in its organ, the county court, to contract for it, in the interest of the Confederacy, was delegated by a Confederate legislature, which .could not survive the Confederacy, but expired when the Confederacy expired.
This is well illustrated by what actually occurred in this state. The last legislature, which was elected under the Confederacy, never met. but was superseded and supplanted by another legislature, which was elected and assembled as the representative body of Virginia, in its legislative department, under oath to support the constitution of the United States. There were then two legislatures in the state at the same time, the one Confederate, and the other Union, unless the former had expired with the Confederacy. It was impossible that both could exist together as the representative legislature of Virginia. The former must therefore have expired with the Confederacy. It was as extinct as the Confederacy itself. And its acts of legislation, which were unusual, and the result of secession, in the interest of the Confederacy, and in aid of it, died with it; and the Confederate quasi corporations, with .their acts of legislation and administration, by the authority of the Confederate State legislature, expired with it. So that contracts made by the county courts, in aid of the Confederacy, .as Confederate quasi corporations, by virtue of a legislative authority, which had become extinct with the fall of the Confederacy, died with the authority by virtue of which they were formed, just as contracts, which had been made with the head of the Confederacy, died with it.
But it is said to be incomprehensible how a county could be “organized in hostility to the Union.” And we are told that “the counties never had any relation *to either the Confederacy or the Union;” and that “the county courts were never in any sense subordinate either to the government of the United States or of the Confederate States;” and that “there was nothing in the constitution or laws of that government (the Confederate) which made the county courts of the states subordinate to the Confederacy.”
The counties are integral parts of the states. They are political as well as territorial divisions of the state, to which they severally belong. And their relation to the United States, or to the Confederate States, was to the one or the other just as was the relation of their state. The counties voted for members of congress and for electors of president and vice-president of the United States or of the Confederate States, just as the relation of their state was to the one or the other. The counties had then a relation to the United States or the Confederate States; and during the war it was a relation of amity or hostility, just as was the relation of the state.
The county courts were, and in an important sense, subordinate to the United States or the Confederate States government; and the constitutions of both governments placed them in that state of subordination. ^ For by both the constitution, laws and treaties of the government are declared to be the supreme laws of the land; and “all executive and judicial officers, both of the Confederate States and the several states, shall be bound by oath or affirmation to support this constitution.” The constitution of (die United States has the same provision. See Constitution of Confederate States, article vi, clauses 3 and 4; and Constitution of United States, article vi, clauses 2 and 3. Can it be truly said that the county courts, composed of justices who were bound by one - or the other of these oaths, *were in no sense subordinate to either government? To ask the question is to answer it.
And is the assertion that the counties of a Confederate state “were organized in hostility to the United States” so preposterous as to be incapable of comprehension? The orders made by the county court of Dinwiddie from February 1861 to the August term 1864, set out in this record, plainly show how that court was organized in the interest of and subordinate to the Confederacy and in hostility to the United States. We need not to be informed at this day that if the justices of any county in a Confederate state had renounced their subordination to the paramount authority of the Confederate States, and had taken an oath to support the constitution of the United States, they would have soon found that they were subordinate to the Confederacy unless protected by the United States bayonets.
But it is further said, the counties could not have been organized in hostility to the Union, because their organization into counties antedated the Confederacy. I cannot agree that because bodies politic had a prior existence, they could not afterwards be organized in hostility to a common enemy. The states of the Confederacy all had an organization as states which antedated the Confederacy, yet they organized in hostility to the United States.
Having answered these objections, we will now come to the consideration of other grounds agai'nst the enforcement of such contracts. They cannot be enforced, because the party contracting to pay, and the *183 party from whom payment is sought, are not the same.
This court in Commonwealth v. Chalkley, 20 Gratt. 404, refused to enforce the con tract, not upon the Aground that the contract was not just, or was not for a humane and lawful purpose; nor upon the ground that it was invalidated by the state constitution; for Judge Joynes, in his opinion, in which a majority of the court concurred, says (page 413) this question he does not propose to consider, and he rests his decision upon the ground, that the sales were made by Chalkley to the superintendent of the penitentiary, upon the credit of the Richmond state government, to which he looked alone for payment, and that the government from which he now sought payment (the present government) was nol the same government, nor its successor, nor responsible for its acts, nor bound by its contracts.
And this doctrine was again declared explicitly, in DeRothschild v. The Auditor, 22 Gratt. 41. Judge Staples, delivering the opinion concurred in by the other judges, says : It is easy “to demonstrate that this is not the Richmond government, nor the successor of that government, and consequently is not answerable for the debts contracted by that government.” In both of these cases, it was held substantially, that the party contracting to pay, and the party from whom payment was demanded, were not the same.
The counties, as before said, are territorial and political divisions — integral parts — of the state. And if the government of the state at Richmond, during the war, could not by its contracts bind the present government, because it is not the same government which made the contract, nor its successor, foi the same reason the county courts which made the contracts during the war, by authority alone of the state government, could not hind the present county courts to their fulfillment. A power cannot be delegated which the party delegating does noi itself possess, "it *is easier to say that these cases are not applicable to the case in hand, than to show it. In my opinion, those decisions, if they are to be respected, are decisive of this case; and that in fact the latter is a much stronger case against the enforcement of the contract, than either of the former.
Upon another ground, the party contracting and the party from whom payment is sought in this case, are not the same. If the county court which was the contracting party is identical with the present county court, it is" really not the paying party, against whom payment is sought to be enforced. Upon whom would the burden fall? Not upon the party who contracted the debt — a Confederate quasi cornoration, but upon the population of Dinwiddie county, who never contracted with or promised to pay to the appellees —upon men who received nothing for what is now sought to be wrenched from them: for they paid cash for all the salt they got to the agent of the county from whom they purchased; and if the county court misapplied it. it is not their fault, and it is inequitable to hold them bound to pay again. And as has been shown, the county court had no authority to act as their agent or representative to make such a contract. If it had any authority to make the contract, it was a Confederate * quasi corporation, acting under an authority delegated to it by a Confederate legislature, which power, as we have seen, was only co-extensive with the existence of the Confederacy. For when that was extinguished, the Confederate legislature ceased to exist, was defunct — dead, and has no living representative or successor. And the county quasi corporation, as a Confederate entity, to whom the authority to make this contract was delegated, if it was ever in fact delegated, is likewise extinct. To whom then can *the appellees look for payment? To the Confederate quasi corporation with whom they contracted? That is extinct. It died with the Confederate legislature, from which it claimed to have derived its authority, which has no more vitality now than tbe_ head of the Confederacy has. And if so, this Confederate entity, of which the county court of Confederate Dinwiddie county was the organ, like the Confederate legislature of Virginia, has no successor; and the present Union quasi corporation of Dinwiddie county is not bound by its contracts, just as the present government of Virginia was held not to be bound by the contracts of Chalkley & DeRothschild with the government of the Confederate state of Virginia. The people of Dinwiddie county who are now sought to be charged, paid for all the salt they got, and it would be very inequitable and unjust to compel them to pay for it again. And it would be equally unjust to compel those to pay who were not citizens of the county at the time.
Upon the foregoing grounds, I think the argument against the enforcement of the contract in question, and all such contracts, may firmly rest, without stigmatizing them as rebellious and treasonable — the ground upon which their payment is inhibited by the state constitution. If there is no other ground upon which they may be avoided than the inhibition of the state constitution, I cannot perceive how the state or the counties can be relieved from any of them.
Regarding Virginia as it is now, though disrupted and dismembered, upon the false pretence that she assented to it, as the identical Virginia which made those contracts, she could not repudiate her own obligations by so providing in her constitution. And we all hold that she is the same Virginia, though under a ^different government.
It was so held in Higginbotham’s ex’x v. The Commonwealth, 25 Gratt. 627, by the whole court. No more could she repudiate obligations which her counties had assumed by virtue of authority which she delegated to their county courts. I f she could not in the one case, she could not in the other. It is as much her act, if clone by a county court by her authority, without which the county court had no power to contract, as if done by the state *184 itself. Qui facit per alium, facit per se, is a maxim of the law. And the doctrine is well settled that a state can no more impair the obligation of a contract by adopting a constitution than by passing a law. The Homestead cases, Judge Christian, 22 Gratt. 266, 281-2, and cases cited. If the -state could repudiate debts so contracted, it can only be upon the ground of a change of relation which affects her political identity, and which would authorize her as a member of the Union to disclaim the obligation of debts which had been contracted in resistance to the Union. And this is very questionable, as under the Federal constitution she is prohibited from passing any law (which embraces constitutional provisions, as is well settled,) which impairs the obligation of a contract. If it be said that the contract having been made in resistance to the power and authority of the United States, it imposed no obligation on the state, and her.repudiation of it in her constitution could not, therefore, be held to be the impairment of the obligation of a contract, that would be conceding that the contract was voidable, antecedent to, and independent of, the constitution, and that its invalidity does not depend upon the constitutional inhibition; and that is what I maintain.
It is otherwise as to an inhibition in the constitution *of the United States. If congress may not legislate to avoid a contract, although the provision in the constitution is only an express inhibition to such legislation by the states, upon which it is unnecessary to give an opinion; the states have the power to alter and amend the Federal constitution. They might erase from it the clause aforesaid altogether, or ordain that it shall not be applicable to a law of congress, or they may expressly provide (as they have done by the fourteenth amendment to the constitution, clause four,) that a certain class of contracts shall be null and-void; that is, that “neither the United States, nor any state, Shall assume or pay .any debt or obligation incurred in aid- of insurrection or rebellion against the United States.”
Whether or not it was rebellion, is a question which we do not mean now to discuss. From our standpoint we could not view it in that light, but it is evidently so treated in this amendment to the constitution. And if it was rebellion, it consisted in the act of secession and in the measures taken to sustain it. The withdrawal of a state and its citizens from the Union, and from obedience to the constitution and laws of the United States, and the confederation with other states to organize a government independent of, and alien to the government of the United States, and in defiance of its authority, constituted the rebellion, if there was rebellion; and this would depend upon the question, whether the states in thus seceding and organizing, were justified in so doing, by violation of the compact of Un.ion by the other states, who were parties to it. This is a question which I do not propose now to consider, because it is immaterial how it may be decided, as to the point in issue inasmuch as the clause in the fourteenth amendment, under consideration, *evidently points to the secession movement as rebellion, and inhibits the payment by the United States, or any state, of all debts contracted in aid of it.
The prohibition of payment is by the United. States or any state. Therefore it does not extend to debts due from individuals or bodies corporate, as distinguished from bodies politic, or such as constitute, or are a part of the political power. It embraces debts contracted by a state, and of course those which are contracted by counties by authority of the state.
It is a conclusion, therefore, which cannot be resisted, that if the contract in question was made in aid of the secession movement, but for which it never would have been made, and was important for the support and maintenance of the Confederacy in its resistance to the power and authority of the United States, its enforcement now falls within the foregoing inhibition of the constitution of the United States. It matters not whether the foregoing amendment to the constitution' was just and right or not. Thus it is written. It has been accepted as a part of the constitution of the United States, and it is binding upon all the courts, state and federal.
But it is only an authoritative declaration by the United States, in solemn form, of a right which I have endeavored to show belongs to the triumphant party in a civil war, or a war between federal states.
This inhibition in the Federal constitution was a matter of great importance to the government of the United States, indeed a requirement of state necessity. It is easy to see at a glance how embarrassing it would have been to the government to have restored all the states which had united in resistance to its authority, with the immense burden of debt which they and their several counties and municipalities had contracted *in maintaining the Confederacy. And upon no principle of law or reason or natural right could a refusal on part of the United States be condemned.
But this restriction was even more important to the states who resumed their position in the Union, and to their respective counties and their municipalities, than for the United States. For them to have undertaken to pay such debts, as were made necessary by secession, and were in aid of the Confederacy, would have been to assume a burden which would have been oppressive, insupportable, and absolutely ruinous to them. And this would have been really the source- of embarrassment to the government of the United States. This restriction imposed on them, in the constitution of the Union, was therefore for their benefit. The failure of the Confederacy. and the incalculable loss of property which it devolved upon its citizens, utterly incapacitated them to assume and pay the accumulation of debt which the states of the Confederacy and their respective counties and municipalities had contracted in their efforts to maintain it.
From what has been said, it is manifest *185 that the contract in question is of the class that falls within the prohibition of the fourth clause of the fourteenth amendment of the constitution of the United States, upon which ground alone, if there was no other, it cannot be enforced. It was a contract made with the organ of a Confederate quasi corporation, the county court of a Confederate county. The contract itself was of a novel and unprecedented character, such as would never have been made but for the act of secession, and the formation of the Confederacy, in resistance to the power and authority of the United States. It was not an act of the county court of Dinwiddie, aside from, and independent of, its relation to the ♦Confederacy in the exercise of its ordinary functions. It was only by its relation to, and connection with the Confederacy, that it became necessary, and it was done, and could only be done by an act of the legislature of a state, which was a member of the Confederacy, and united in the organized resistance to the power and authority of the United States. And it was essentially in aid of the Confederacy and of that organized resistance to the United States. If the United States, one of whose methods of reducing the Confederate States to submission to their authority, was to cut off their people from a supply of food, of clothing, of medicine, and all the essentials of living, could have cut off the people of Virginia and of the Confederacy from a supply of salt, an article of vital necessity, it would have been effectual to the speedy overthrow of the Confederacy. The effect of these contracts was to supply that article of necessity, and to enable the Confederacy longer to resist the power of the United States. It is too plain for further discussion, that this contract, and all such, were made by the county courts in their relation to the Confederacy, and as the organs of Confederate quasi corporations in the interest of the Confederacy, and were important, if not essential, for its support and maintenance in resisting the power and authority of the United States, and were made by authority of a state, which was in the confederation against the United States.
But it is said it was an act of humanity to furnish salt to the suffering Confederates, and the claim for compensation should not be rejected. By another order of the same court, provision was made by a loan of money on the bonds of the county for the support of soldiers of the Confederacy, who were disabled, and of the fathers, mothers, wives and children *of soldiers who were killed or died in the service of their country. Can it be conceived that there rests upon the county of Dinwiddie an obligation to pay the claims of the appellees, which is more sacred and binding than the obligation to pay the former? Yet upon the competing doctrine that obligation is canceled, whilst the families of these soldiers who were killed or died in the service, and the soldiers who were disabled in the service of their country, are to be taxed to pay the latter.
But the case cannot be decided on such grounds. Doubtless the people would have suffered if they had not been supplied with salt, and the Confederacy would have sooner collapsed. And so a besieged city would have been forced to surrender if the besieged could not have been supplied with food. It would certainly be an act of humanity to supply food to the starving. But it could not be addressed to the conqueror as a reason why he should require the man to be paid who furnished salt in the one case, or food in the other, whereby resistance to his power and authority were protracted; that it was an act of humanity to furnish them, and that in so doing he had come to their relief as “angels of mercy.”
Doubtless Mess. Stuart, Buchanan & Co. employed their energies, and very commendably, in the production of salt. And whilst they in a legitimate way accumulated for themselves large fortunes, they were rendering essential service to the Confederacy — a service which relieved them from military duty, in the camp and the field, which otherwise would have devolved on them, as on others. Their exemption from military service was, probably, because the supply of salt was essential to the support and maintenance of the Confederacy. Others served the Confederacy in *other ways outside of the army; but all doing what they could for the common cause. They should be paid for the salt which they furnished the county court of Dinwiddie, in the performance of their part of the work, in which all true men in the state were engaged, to defend the liberties of their country, if the party to whom they sold, a quasi corporation of the Confederacy, were now in existence and had wherewithal to pay. And so they ought to be paid for salt which they sold to the Confederate government, if it were in existence.
But in no just sense are the people of Dinwiddie, who paid for all the salt they got, and never promised to pay Stuart, Buchanan & Co., bound morally, equitably or legally to pay it again. The only advantage they derived from the contract made by the county court, beyond what they paid for, was the aid given to the Confederate cause by the furnishing of salt, and that was as much to the advantage of the appellees as to them. If the appellees must lose it, thousands of our people toiled and periled their lives, and gave their time, their labor and their fortunes, for the common cause, and got nothing. The cause in which all were engaged perished, and desolation and ruin were brought upon the slates and their populations, who were consecrated to its success. And it does not seem right that the people who have paid for all the salt they got., and have derived no other advantage from the supply of the salt to the county, than such as was enjoyed in common with them by the appellees, that a people who periled their lives in the field and camp, who were disabled in the service, and the fathers and mothers and wives and children of those who were killed or died in the' service of their country — in a word a people who suffered the loss of property *and their almost entire means of subsistence, in their devotion to the cause *186 which was lost, and which was the common cause of the appellees and themselves, should now be required to pay twice for the salt, in order to make good the losses incurred without their fault, by the appellees, in addition to bearing their own burdens and sustaining their own losses.
Numerous decisions of the Federal courts have been cited in opposition to positions which are attributed to counsel in argument, and consequences are deduced from those positions to show their absurdity. As I have' not assumed or sanctioned any of those positions, I am not responsible for the consequences deduced from them. Nor have I in this opinion assumed any position, I believe, which is in conflict with any of the decisions cited, except that I hold that the Richmond government was during the Confederacy the de jure government of Virginia; and inasmuch as the Federal courts, for the most part, concede that it was a de facto government, the difference of opinion on this point is not material in the decision of this case. If I seem to go further than the Federal courts, in relieving the states and the people who were united in the Confederacy from responsibility, embarrassment and loss, it enures to the benefit of those who suffered the loss of fortune and their almost entire means of subsistence by their devotion to what they believed to be the cause of national independence and liberty. And this should not be surprising when it is considered that the subject is viewed by us from different standpoints.
With regard to Jones v. The City of Richmond, 18 Gratt. 517, Town of Danville; v. Pace, 25 Gratt. 1, and Miller & Franklin v. City of Lynchburg, 20 Gratt. 330, it would be easy to show by a review of those decisions *that there is nothing in this opinion in conflict with either of them.
But it is said that the doctrines of this opinion tend to the repudiation of all debts contracted during the war; and this upon the ground that there is no difference as to the present obligation of debts contracted by individuals, and those contracted by the state or the counties of the state during the war; and that if the latter are not binding and valid now, the former are not.
If this is true, the competing view is equally liable to the same objection. For, according to that, contracts made by the state or the counties, by authority of the state, in aid of the rebellion, are valid; and if there is no difference, all contracts made by individuals in aid of the rebellion are invalid. But this court has held otherwise. Bier & Mann v. Dozier, 24 Gratt. 1. The constitution of the United States makes a difference. For the prohibition is limited to debts or obligations incurred by the state or the United States, and does not extend to contracts made by individuals. And I think there is good reason for the difference.
It is obvious that the principle upon which the contract is voidable is applir'''*’ to contracts of the political power wb' . resisted the authority which is established by the war, arid not to contracts in general made by individuals, though they gave aid to the resistance. Individuals were not responsible for the war, nor can be recognized as parties to it. It must, upon well established principles of international law, be regarded as a public war — a war inter gentes, and not as a war between individuals. Their contracts may, therefore, be enforced, though they were in aid of the war. There are other reasons which might be *given in support of this conclusion, if this opinion were not already too extended.
I will notice only one other objection which has'been urged against my conclusions. It is, that if the contract in question was not valid and binding on the people of Dinwiddie county before, the act of February 28, 1866 (Session Acts of 1865-’6, p. 187) gives validity to it and lays the people of the county under obligation to fulfill it.
I would not indulge in remarks of the slightest disparagement to the legislature which passed this act. It certainly embraced some of our ablest and best men. The lamented death of two of them that I might name I have regarded as a great loss to the state; Yet I cannot indorse as wise all that it did nor all that it did not do. It was assembled soon after the war, in troublous times, when everything was unsettled, and dark, angry clouds hovered over and obscured the political horizon. The times were certainly very unpropritious for calm and unbiased and unconfused legislation. This act shows upon its face that it was hastily, carelessly, and loosely drawn. It undertakes, it seems to me, not only to give validity to contracts made by the state government, but also to contracts made by the Confederate government. I was not aware before that much importance was ever attached to it. It is strange that it has not been relied on more frequently for the settlement of controversies by the courts. I do not remember to have known it to be relied on before, by either party, in any controversy in this, or any other -court. If it had never been passed, I hardly think that there would have been any destruction of titles, or ruin of estates, for the want of it; or that the, probate of wills, or the acts of executors, administrators, guardians or other *fiduciaries, would ever have been disturbed by reason of its not having been enacted. And it is my impression that if there had. been no such act in our statute book, the bonds of matrimony would have been as firm as they are with it, and the offspring of the marriages as legitimate. It is also my impression that the punishment of felons could not have been made false- imprisonment, nor murder — and that the bonds of society would have continued as unbroken as they are, and public morals as secure. And I think so because I do not think that it has ever been held by any tribunal that the acts of legislation and administration during the war, in the usual routine and ordinary course of administration, not in the interest or in aid of the Confederacy, and of the resistance to the power and authority of the United States, were not as valid and binding as they would have been *187 if the states had remained in the Union and : there had been no secession. This is my opinion, and I believe it is the opinion of the court.
But I hold that the legislature which ( passed this act was invested with no power to impose such an obligation on the people of the state or the several comities. It had only legislative powers under the constitution. It had no power to pass judicially upon the question of the liability of a county or of the people thereof, to pay such debts, much less to create a liability on them to pay, when none antecedently existed. It is a judicial question which could ( ! ( only be decided by the courts.
I am of opinion, therefore, that the contract in question ought not to be enforced against the people of Dinwiddie county. I think there is error also in the order of this court, allowing six per cent, interest when the contract set up by the appellees stipulated *for only three per cent, interest.† I am of opinion that there is error in the judgment of the circuit court, and that the same be reversed.
MoncurE, P., concurred in the opinion of Anderson, Ji
Staples and Burks, Js., concurred in the opinion of Christian, J.
The judgment was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that the circuit court did not err in declaring by its decree, that the appellant was liable to the appellees for the claim asserted and proved by them, for salt furnished to the said appellant, under said contract of the 19th May, .1803. But the court is of opinion that the circuit court did err in not scaling the amount of said claim from its nominal to its true value in gold, according to the scale of depreciation of Confederate currency at the time when such contract was made and entered into; and it is decreed and ordered that to this extent, the said decree be reversed and annulled. And the court proceeding to enter such decree as the said circuit court ought to have rendered, it is further decreed and ordered, that the appellees recover against the appellant *two thousand * and fifty-two dollars and ninety-four cents, with interest thereon, to be computed after the rate of six per centum per annum, from the 1st of January, 1863, till payment, and ■ their costs by them expended in the : ( \ prosecution of their appeal in the said circuit court; and they being the parties substantially prevailing, it is ordered that they also recover against the appellant their ( costs by them about their defence in thi! behalf expended in this court. Which is ordered to be certified to the said circuit court of Dinwiddie county.
Judgment reversed in dart, but affirmed ON THE IMPORTANT POINT.

The court in the opinion holds that the claim of the appellees “is a valid claim, arising upon a contract made with the county court of Dinwiddie for salt furnished said county, and the claim for which was recognized by said county in writing, and made a matter of record as shown by the following order:
“Virginia — Tn Dinwiddie county court, June 16th, 1863: Ordered that the clerk of this court issue a bond for 53,695.30, payable to Stuart, Buchanan & Co., for salt to be delivered by contract, the said bond to be paid the 1st January, 1866, with interest at three per cent, thereon from the 1st January, 1863."

Sealed Instruments — AeknOTrledging: Seal in Body of Instrument.—In Bradley Salt Co. v. Norfolk, &c., Co., 95 Va. 461 the discussion in the opinion of the principal case, pages 530, 531, concerning the validity of a paper exhibited in the record as a bond of the county of Dinwiddie is referred to as sustaining the proposition that by the Virginia statute in order to constitute a sealed instrument the seal (even if an actual seal and not a scroll) must be acknowledged in the body of the instrument.